MAYOR AND ALDERMEN OF THE CITY OF
ANNAPOLIS ET AL. *v.* ANNE ARUNDEL
COUNTY, MARYLAND ET AL.

[No. 184, September Term, 1973.]

*Decided January 30, 1974.*

*Opinion confirmed March 18, 1974.*

*Motion for rehearing filed February 28, 1974; after hearing, opinion confirmed without change March 18, 1974.*

The cause was argued before MURPHY, C. J., and BARNES, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Eugene M. Lerner, City Attorney,* with whom was *Richard G. Anderson, Assistant City Attorney,* on the brief, for appellants Mayor and Aldermen of the City of Annapolis and the Historic District Commission of the City of Annapolis. *John C. Murphy, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Henry R. Lord, Deputy Attorney General,* on the brief, for appellant State of Maryland, acting on behalf of the Maryland Historical Trust and Commission on Negro History and Culture.

*John M. Court, Assistant County Solicitor,* with whom was *Paul F. Borden, County Solicitor,* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

The principal questions presented to us for resolution in this appeal arise out of the construction and application of the provisions of Maryland Code (1957, 1970 Repl. Vol.) Article 66B, §§ 8.01 through 8.15, under the subtitle "Historic Area Zoning" and Chapter 22, Article XI, "Historic District," Sections 22-226 through 22-236 of the Annapolis City Code, implementing in substantially the same basic language that which is contained in Art. 66B, §§ 8.01 through 8.15, insofar as these provisions relate to the Mt. Moriah African Methodist Episcopal Church (Mt. Moriah), located on Franklin Street in the City of Annapolis and owned by Anne Arundel County.[1]

Mt. Moriah was built in 1874 at its present location at 82-84 Franklin Street to the rear of the Courthouse in

---

1. The church in question bears the distinguished name "Moriah" which in Hebrew means "provided by Jehovah." The hill of Jerusalem on which Solomon built the Temple was called "Mount Moriah," 2 Chr. 3.1, and was the hill on which Abraham was prepared to offer Isaac, Gen. 22.2.

Annapolis. The congregation, however, was organized in 1799 and consisted of free blacks rather than those held in slavery. The cornerstone of the present church building is dated 1816 and was the cornerstone of an earlier church structure built by the Mt. Moriah congregation. As will be more fully developed later in this opinion, Mt. Moriah is a significant symbol of black society and of the accomplishments of free black persons surrounded, as it were, by conditions of chattel slavery and racial discrimination.

Historic Annapolis, Inc., a private organization, conducted a survey in 1970 of historic structures in the City of Annapolis under the direction of duly-qualified specialists. Their material was submitted to a "jury" of qualified architects and architectural historians and Mt. Moriah was given the highest rating of "outstanding." [2] As a result of a nomination made by the State of Maryland, through the Governor's Advisory Commission on Historic Preservation, Mt. Moriah was identified and placed on the National Register of Historic Places. The description in the nomination — accepted by the National Register of Historic Places, an agency of the Federal Government — stated, in part:

"Mt. Moriah Church is an exceptional example of small scale Victorian Gothic Ecclesiastical architecture, and is an important contribution to the architectural collection of Annapolis. . . . Mt.

2. The "jury" consisted of:

(1) Carl Fais, a Fellow of the American Institute of Architects and a founding member of the American Institute of Planners. He has the degree of Bachelor of Architecture from the University of Pennsylvania and the degree of Master of City Planning from the Massachusetts Institute of Technology. He is a former Trustee of the National Trust for Historic Preservation.

(2) Oren M. Bullock, Jr., also a Fellow of the American Institute of Architects, who was active in the early years of the restoration of Williamsburg, Virginia, and who is in active practice.

(3) Dr. William B. Murtaugh, Keeper of the National Register of Historic Places, Department of the Interior of the United States Government.

Moriah is one of Annapolis' hidden architectural treasures, is of paramount importance in black history, and should be preserved at all costs."

Although the exterior of the church building is in need of "some masonry (namely pointing) and window frame and cornice repair," the building generally appeared to be in good condition.

After negotiations with the Trustees of Mt. Moriah, it was purchased by the appellee, Anne Arundel County (the County), by a deed dated May 28, 1970, and duly recorded among the land records of Anne Arundel County. At that time, Mt. Moriah was not included within the boundaries of the Historic District of the City of Annapolis, but was included in that District shortly after its purchase by the County.

One of the appellants, the Mayor and Aldermen of the City of Annapolis, established the Historic District Commission of the City of Annapolis (the Commission), pursuant to Art. 66B, § 8.03, as well as the Historic District within the City of Annapolis in accordance with the "Historic Area Zoning" enabling act, Art. 66B, §§ 8.01 through 8.15. Article XI, "Historic District," Sections 22-226 through 22-236 of the Code of the City of Annapolis, was submitted to a referendum of the voters in the City of Annapolis at the general election of 1969 and was ratified by the electorate.

On September 27, 1972, the Mayor and Aldermen of the City of Annapolis filed a suit in equity (Equity No. 21050) in the Circuit Court for Anne Arundel County, seeking to enjoin the County from awarding a contract for the demolition of Mt. Moriah and from demolishing it and also seeking a declaratory decree that the County must comply with the Historic District Ordinance of the City of Annapolis, Art. 66B of the Maryland Code, and the Building Code of the City of Annapolis. On June 7, 1973, the County did apply for a permit with the Building Inspector's Office of the City to demolish Mt. Moriah. No further proceedings have been taken in that suit.

The demolition permit filed by the County was sent by the Building Inspector to the Commission in accordance with the provisions of the Historic District Ordinance and the established practice. The Commission thereafter gave the usual notice of the filing of the application by the publication of its standard advertisement for a public hearing on the application. The County appeared at the public hearing on June 20, 1973, and was represented at that hearing by Robert Strott, Director of Administration for the County.

At the June 20 hearing, substantial testimony was taken and documentary evidence was submitted by a number of individuals and organizations in opposition, including two of the appellants, the Maryland Historical Trust and the Maryland Commission on Negro History and Culture. This testimony and supporting documents detailed the historical and architectural merits of Mt. Moriah and its particular relevance to the black community. There was also evidence submitted indicating alternative methods for the construction of the proposed parking facility without demolishing Mt. Moriah. The County, however, offered no evidence concerning the historical or architectural merit of Mt. Moriah or its relevance to the black community. Mr. Strott testified in regard to the proposed use of the site on which Mt. Moriah is located for a parking structure and possible expansion of the courthouse and related facilities now in the courthouse. Since the County's testimony clearly indicated that it had developed only preliminary plans, it was impossible to state whether the site occupied by Mt. Moriah would be used for parking facilities, an addition to the courthouse, or a combination of both. It was stated that if the Commission were to grant the demolition application, the County would use the site in question for a temporary parking area until such time as the County could devise final plans for the utilization of the space. Mr. Strott testified that Mt. Moriah was, in his opinion, an obstacle to the construction of the courthouse complex; that it would be expensive to move Mt. Moriah; and, that Mt. Moriah was not an appropriate structure for use in the courthouse complex.

During the June 20 hearing, Mr. Strott frequently referred to an "Avtech Report," which, he said, discussed the needs of the County for expanded courthouse facilities. At that time, Mrs. John Symonds, the chairwoman of the Commission, asked Mr. Strott if he would make the Avtech Report available to the Commission, whereupon counsel for the various parties indicated that if that report were introduced into evidence — Mr. Strott not having the report with him at the hearing — they desired an opportunity to cross-examine Mr. Strott on the contents of the report.

Mrs. Symonds testified that, during a break in the hearing, she asked Mr. Strott if he would extend the hearing to a later date for the purpose of discussing and reviewing the contents of the full Avtech Report and Mr. Strott agreed to this. At the conclusion of the June 20 hearing, a motion was made and passed to continue the hearing to a later date. Mr. Strott, after the conclusion of the June 20 hearing, did furnish the Commission with a full copy of the Avtech Report. Mrs. Symonds, prior to advertising the resumed hearing date, telephoned Mr. Strott and they arrived at a mutually agreeable date for the resumption of the June 20 hearing, namely, July 25, 1973.

At the resumed hearing on July 25, Mr. Strott again represented the County, together with Randolph Rozencrantz, Central Services Officer for the County, both of whom testified on behalf of the County. The County again asked for permission to demolish Mt. Moriah.

The Commission, on August 7, 1973, issued its unanimous, written decision denying the County's application to demolish Mt. Moriah, as follows:

"Pursuant to a public hearing held before the Historic District Commission of the City of Annapolis on June 20, 1973, on the application of Anne Arundel County, Maryland, for a permit to demolish Mt. Moriah Church at 82-84 Franklin Street, Annapolis, said public hearing being continued at a further public hearing on July 25, 1973, by the agreement of the applicant and the Commission, and after reviewing all of the exhibits,

testimony, and evidence on file in the case, the Commission finds as follows:

"(1) the Commission finds and deems the structure, Mt. Moriah Church to be valuable according to studies performed for the Historic District of Annapolis and for this particular building and to have significant historical and architectural value in and of itself and in relation to the surrounding area.

"(2) the Commission further finds that the demolition of the structure would be a great loss, to the City of Annapolis, to the State of Maryland and the United States of America, and therefore, must be guided by the provisions of § 22-231 (f) (1) of the Historic District Ordinance.

"(3) the Commission further finds that while the record in this case discloses several alternative plans or proposals which were suggested as feasible alternatives to the demolition of Mt. Moriah Church, the applicant, Anne Arundel County, did not indicate or show any serious consideration for any suggested alternative plans or proposals to preserve the structure.

"(4) the Commission further finds that the structure sought to be demolished, Mt. Moriah Church, is valuable for the period of architecture it represents and is important to the neighborhood within which it exists, and that there was insufficient evidence to support a finding that retention of the Church would be a deterrent to any major improvement program of the applicant, which would be a substantial benefit to the City of Annapolis; and that there was insufficient evidence to support a finding that retention of the Church would cause undue financial hardship to the applicant, but, on the contrary, there was sufficient testimony and other evidence to

> support a finding that retention of the Church would be in the best interest of the majority of the community in which it is located.
>
> "THEREFORE, the application of Anne Arundel County for the demolition of the Mt. Moriah Church at 82 and 84 Franklin Street, be and the same is hereby denied."

On the same day, Mr. Strott sent a letter by certified mail to Mrs. Symonds, stating that it was the County's position that, inasmuch as the Commission had taken no action on the County's application within the 45-day period set forth in Art. 66B, § 8.12 of the Maryland Code and in Section 22-233 of the Historic District Ordinance, approval of the application had "been rendered by operation of law" and that the County was "proceeding with its plans accordingly."

The City of Annapolis and the Commission on August 15, 1973, filed a bill of complaint in the present case (Equity No. 21582), seeking a temporary and permanent injunction restraining the County and Joseph W. Alton, Jr., the County Executive, from demolishing or damaging Mt. Moriah, unless and until approval had been granted by the Commission; an order that the County Executive notify any contractors, agents, servants, or employees accordingly, and other relief. The Circuit Court for Anne Arundel County (Childs, J.) granted a temporary restraining order on August 15, 1973, and the City posted the required $75,000.00 bond on August 17.

On August 17, 1973, the State of Maryland, acting on behalf of the Maryland Historical Trust and the Maryland Commission on Negro History and Culture, petitioned for leave to intervene as a party plaintiff and such permission was granted the same day.

In its answer, the County alleged that it was not subject to the jurisdiction of the Commission and that, even if it were, the application for demolition of Mt. Moriah had not been acted upon by the Commission within the period of time required by the Historic District Ordinance and the application was thus automatically approved. The County

filed a cross bill of complaint, alleging that it had an investment of $175,000.00 in the Mt. Moriah site for the purposes of expanding the courthouse facilities and that the continued interference with this objective constituted continuing damages in the amount of 1% per month as long as such interference continues. It prayed for a monetary award of $1,750.00 a month for each month the County was delayed in beginning construction, beginning with June 7, 1973, and for other relief. The plaintiffs duly filed an answer to the County's cross-bill on August 20, 1973, denying its allegations, and alleging that the County had no plans and that the damages were speculative.

A hearing on the merits was heard by the Circuit Court for Anne Arundel County (Weant, J., specially designated) on August 20, 1973. After taking testimony, receiving various documents into evidence, and hearing the arguments of counsel for the respective parties, he rendered his written opinion and filed an order on September 5, 1973, ruling in favor of the County, dissolving the temporary injunction, granting leave to the County to pursue the damages alleged in its cross bill, if it had any, and requiring the plaintiffs to pay the costs.

In his opinion, Judge Weant concluded that although the City was correct in regard to the 45-day issue, the County was not subject to the jurisdiction of the Commission.

The City of Annapolis filed a petition for a stay of the decree of September 5, 1973; and this stay was granted on September 7. After an additional hearing in the circuit court, the City and County entered into a stipulation that no supersedeas bond would be required to stay the operation of the decree of September 5.

Timely appeals from the decree of September 5 to the Court of Special Appeals were filed by the City of Annapolis, the Commission, the State of Maryland, and the Maryland Commission on Negro History and Culture; and a timely cross-appeal was filed by the County from that portion of the decree ruling against the County on the 45-day issue.

On September 13, 1973, the County filed a petition for a writ of certiorari with this Court, pursuant to Maryland

Rule 811, to transmit the record in the case from the Court of Special Appeals to this Court because of the public importance of the case and the need for an early final decision. The City, the Commission, and the State also urged that we grant the County's petition, which we did on September 21, 1973.

The three principal questions presented to us by the appeal and cross-appeal are:

(1) Was the decision of the lower court in regard to the 45-day provision correct?

(2) Was the County subject to the jurisdiction of the Commission?

(3) Was the Commission's decision arbitrary or capricious as a denial of due process of law or as a taking of the County's property without paying just compensation?

We have concluded that the lower court ruled correctly in regard to the first question, but was in error in holding that the County was not subject to the jurisdiction of the Commission. We are also of the opinion that the Commission's decision was not arbitrary or capricious, but, on the contrary, was properly reached on the record before it.

1.

In our opinion, the chancellor properly found from the facts that time for Commission action was extended by mutual agreement between the Commission and the County as contemplated by Article XI, § 22-233(d) of the Code of the City of Annapolis. The chancellor made a careful review of the facts in regard to this point and we adopt his findings and conclusions on this point as follows:

"Article XI, § 22-233(d) of the Code of the City of Annapolis states:

'(d) Failure of the Commission to act within forty-five days from the date an application is filed shall constitute approval unless an

extension is agreed upon mutually by the applicant and the Commission.'

"Article 66B, § 8.12 of the Annotated Code of Maryland states in part:

'... The failure of the Commission to act upon an application within forty-five (45) days from the date the application was filed shall be deemed to constitute automatic approval of the proposed changes unless an extension of this forty-five day period is agreed upon mutually by the applicant and the Commission or the application has been withdrawn.'

"The transcript of testimony taken on June 20, 1973, reveals the following remarks as having been made while Mr. Strott was discussing the requirement for additional facilities for the Circuit Court for Anne Arundel County, at page 41:

'MR. DEHART: When could we obtain copies of these reports and any updating data that's available?

'MR. STROTT: I'll give you a copy of these. These are going to be Xeroxed copies, because they are working documents. I can get them to you early next week, because I'll be out of town, and I'll have them started while I'm gone, a working copy of the central services officer responsible for space. You will see the changes that are required, because it's precious, space.

'MR. MURPHY: Excuse me, I didn't understand what reports these are, I'm sorry.

'MRS. SYMONDS: Mr. Strott, would you briefly —

'MR. STROTT: First of all, I submitted excerpts from three Grand Jury Reports which now the Commission has, which makes

reference to the crowded conditions of the courthouse. It makes reference to deplorable parking conditions.

'I also made reference to an Avtech study report, which is what we call a space utilization report which we use as a tool. That report, which was a study document by Avtech in 1969, I think it was published in 1970, pointed out that the courthouse, plan for the courthouse development — I say that is a working document that is updated from time to time.

'MR. MURPHY: Our position would be that we would have to have an opportunity to examine these documents and be able to question Mr. Strott on them. Our position is that there are a number of alternatives that have to be explored here.

'We don't question examining these documents, but it would be inappropriate to have them introduced after the hearing is over.

'MR. STROTT: Well, the county's position is this is a matter of background. We're an extension of the state and we have a responsibility to house the courts and we will proceed.

'MRS. SYMONDS: This is a representative of the state.

'MR. STROTT: Yes, and we have a disagreement.'

"At page 126 of the transcript of the same hearing the following appears:

'MRS. SYMONDS: . . . I would like to say I think Mr. Strott has left. Maybe this a good time to say it. We discussed with him the possibility of continuing this hearing on the basis of a request for a chance to review the

reports and so forth upon which the county has based its plans for demolition, and he was agreeable to this. So I think we probably will do that.'

"Again, at page 137 we find:

'MR. DEHART: I would like to add before we adjourn that the comments — I suggested to Mr. Strott, to benefit the county's case, that he should provide whatever material he can to the Commission to demonstrate the county's needs for additional space, as well as the space for additional parking thank you.

'MRS. SYMONDS: Would someone like to make a motion we continue the hearing?

'MRS. HARDESTY: Mrs. Symonds, I would like to make this motion, that since we have many other problems to resolve, that we continue this hearing between the county and the Historic District Commission.

'MRS. SYMONDS: Would someone like to second the motion?

'MR. DEHART: Second.

'MRS. SYMONDS: Any discussion?

'MR. CHRISTHILF: Mrs. Symonds, are we going to set a time for the continuance?

'MRS. SYMONDS: Mr. Strott is on his way to New York. I talked to him about it, so I don't think we can set a date until — the public should know the reasons for it. I think we have to allow time for people to give the proper importance to the work.

'MR. DEHART: I think one of the purposes for the continuance from my point of view is to allow Mr. Strott to provide evidence, as I have suggested, and I think as was brought out tonight, for anyone else, when he does provide

that information to review that material, as well as the material submitted tonight and for us during this period to consider the material submitted to us.

'MRS. SYMONDS: Anymore discussion on the motion? All those in favor?

'(Meeting adjourned.)'

"The County provided the reports requested. Later by agreement between Mrs. Symonds and Mr. Strott the date of July 25, 1973, was established for the continuation of the June 20 hearing. The transcript of testimony taken at that meeting *with Mr. Strott present* reveals at page 140:

'MRS. SYMONDS: We will get on to the main reason this special meeting was called, a continuation of the meeting we had previously on Mt. Moriah Church.

'This is a public hearing on the proposed demolition of the church by the Anne Arundel County government. If anybody more wants to testify, we will be glad to have them testify. Is there anymore testimony? We have had extensive testimony at the last meeting.

'Do any of the lawyers wish to proceed at this point?

'MR. BLONDELL: Are you calling the opposition, Madam Chairman?

'MRS. SYMONDS: Since the last meeting, Mr. Strott, director of administration for the county, has given us the report which was mentioned at the last meeting but not available. Since that time, those who wished to examine it have had that opportunity. At this time, if no one wishes to give testimony, I will ask Mr. Strott if anyone from the county would like to come up and make a last statement on the project.'

"The County did not object to this second session; on the contrary Mr. Strott participated. Subsequently at our hearing he testified that he had been unaware of the requirement for the Commission to render its decision within forty-five days of the filing of an application. He learned of this after the Commission hearings. We think that he also learned or suspected that the Commission was not going to rubber stamp the County's request and decided to use the forty-five day limitation as a guarantee to victory. We are also of the opinion that he would have agreed to a continuance albeit with the knowledge of the time limitation.

"The record clearly indicates that the extension of the hearing was to accommodate the County. In addition, the Commission wanted more information about the plans and requirements of the County and the County agreed to provide it. There is no doubt in our mind that the continuance of the meeting was commutual. The fact that this arrangement was called a continuance instead of an extension seems to us to be of little moment as the effect was obvious to all. This action cannot be said to have been hatched under a rose."

Not only are the chancellor's findings and conclusions on this point not clearly in error, Maryland Rule 886, but they are fully supported by the great weight of the evidence.

2.

In our opinion, however, the chancellor erred in holding that the County was not subject to the jurisdiction of the Commission in connection with demolition of Mt. Moriah. Basically, the resolution of this question turns upon the proper statutory construction of the provisions of the Act of 1963, Ch. 874, as amended, in regard to "Historic Area Zoning" and the provisions of the Historic District Ordinance of the City of Annapolis. We now turn to a consideration of these statutory provisions.

The Act of 1963, Ch. 874 was the first legislative

enactment in Maryland in regard to Historic Area Zoning. The title to that Act indicates that the sections added to the Code were to be under "the new sub-title 'Historic Area Zoning' " and that these new sections made:

". . . provision for the preservation of structures of historic and architectural value in the several counties and municipal corporations of this state, establishing the procedures applicable to this power and the rights and duties of the officials of the counties and municipal corporations in relation thereto and relating generally to the preservation, maintenance and reconstruction of certain structures of historic and architectural value in this state . . . ."

Governor Tawes approved the Act on May 6, 1963, and it took effect on June 1, 1963.

As originally passed, the Act was effective only in Anne Arundel, Carroll, Cecil, Charles, Frederick, Harford, Howard, Kent, Prince George's, and St. Mary's Counties. By subsequent amendments, other counties were added to those in which the Act was originally effective and finally, by the Act of 1969, Ch. 471, the Act was made effective state-wide and so appears in the recodification of Article 66B of the Maryland Code by the Act of 1970, Ch. 672, effective January 1, 1971.[3] Certain other amendments were made by the Act of 1971, Ch. 440.

It should be noted that the Act of 1968, Ch. 162 added a new Section 40A to Article 66B of Code (1957, 1967 Repl. Vol.) "to permit historic district Commissions to accept gifts and to acquire architectural easement[s]." The Act of 1968 added the last sentence to what now appears as § 8.03(a) of Article 66B in Code (1957, 1970 Repl. Vol.) and all of § 8.04 (formerly Section 40A) of that Article.

Section 8.01 of Art. 66B of Code (1957, 1970 Repl. Vol.)

---

**3.** Montgomery County was added by the Act of 1965, Ch. 294; Baltimore City by the Act of 1966, Ch. 463; and Queen Anne's County by the Act of 1966, Ch. 546.

declares the State's purpose in enacting this new concept. It reads as follows:

"§ 8.01. Declaration of public purpose; power to regulate historic, etc., structures; purpose of ordinance or resolution; 'structure' and 'appurtenances and environmental settings' construed.

"(a) The preservation of structures of historic and architectural value together with the appurtenances and environmental settings is a public purpose in this State. The board of county commissioners or county council of every county in the State and the mayor and city council, by whatever name known, of every municipal corporation in this State and the mayor and city council of Baltimore City have power by ordinance or resolution to regulate the construction, alteration, reconstruction, moving and demolition of such structures, their appurtenances and environmental settings within their respective limits. Hereafter in this subtitle such counties and municipal corporations are referred to as 'county' or 'counties' or 'municipal corporation' as the case may be. . . .

"(b) The purpose of an ordinance or resolution in any county or municipal corporation shall be (1) to safeguard the heritage of the county or municipal corporation by preserving the district therein which reflects elements of its cultural, social, economic, political, or architectural history; (2) to stabilize and improve property values in such a district; (3) to foster civic beauty; (4) to strengthen the local economy; and (5) to promote the use and preservation of historic districts for the education, welfare, and pleasure of the residents of the county or municipal corporation."

Section 8.02 grants the power to establish historic or

architectural districts. It provides that for the purpose of the subtitle:

" . . . each county and each municipal corporation may establish, change, lay out, and define districts which are deemed to be of historic or architectural value, following the procedure in such county or municipal corporation applicable to the establishment or change of areas and classifications of zoning."

Section 8.03 provides that a county or a municipal corporation "may create a commission to be called 'the historic district commission.'" The commission shall have a membership of from three to seven persons, all of whom are residents of the county or municipality as the case may be. The terms and other data in regard to the commissioners are then given and it is provided that:

"County or municipal authorities may consult private societies or agencies to request the names of possible members on a commission. The commission shall have the right to accept and use gifts for the exercise of its functions."

As already indicated, § 8.04 is the provision in regard to permission to acquire architectural easements added by the Act of 1968, Ch. 162 and provides as follows:

"The commission may purchase architectural easements in connection with structures located in or adjacent to the historic district. Such easement shall grant to the commission, the residents of the historic district, and the general public the perpetual right to have the exterior appearance of any structure upon which it is applied retained in substantially the same character as when the easement took effect."

Section 8.05 provides:

"Before the construction, alteration, reconstruction, moving, or demolition of *any structure* is

made *within* the county or *municipal corporation,* if any changes are involved which would affect the *exterior appearance* of a structure visible or intended to be visible from an adjacent public way in the district, the person, individual, firm, or corporation proposing to make the construction or change *shall file with the commission* an application for permission to build, alter, reconstruct, move, *demolish,* or make the addition. Every such application shall be referred to and considered by the historic district commission and accepted or rejected by the commission. *No permit for any such change may be granted* until the commission has acted thereon as hereinafter provided." (Emphasis supplied.)

The factors to be considered by a commission, the scope of its consideration, and the type of approach to be used by a commission are set forth in §§ 8.06, 8.07, and 8.08.

The factors to be considered by the commission are:

"(1) the historic or architectural value and significance of the structure and its relationship to the historic value of the surrounding area; (2) the relationship of the exterior architectural features of the structure to the remainder of the structure and to the surrounding area; (3) the general compatibility of exterior design, arrangement, texture, and materials proposed to be used; (4) to any other factors including aesthetic factors which the commission deems to be pertinent."

The scope of the commission's consideration is:

"The commission shall consider *only exterior features* of a structure and shall not consider any interior arrangements. Also, the commission shall not disapprove an application except with respect to the several factors specified in § 8.06 above." (Emphasis supplied.)

In regard to the type of approach to be used by the commission, § 8.08 provides:

> "The commission shall be strict in its judgment of plans for those structures deemed to be valuable according to studies performed for districts of historic or architectural value. The commission shall be lenient in its judgment of plans for structures of little historic value or for plans involving new construction, unless such plans would seriously impair the historic or architectural value of surrounding structures of the surrounding area. A commission is not required to limit new construction, alteration, or repairs to the architectural style of any one period."

Sections 8.09 and 8.10 are of substantial importance in the present case and provide:

> "§ 8.09. Application for reconstruction, alteration, etc., of structure of unusual importance.
>
> "(a) If an application is submitted for reconstruction or alterations affecting the exterior appearance of a structure or for the moving or demolition of a structure, the preservation of which the commission deems of unusual importance to the county or municipal corporation or unusual importance to the entire State or nation, the commission shall attempt with the owner of the structure to formulate an economically feasible plan for the preservation of the structure. Unless in these circumstances the commission is satisfied that the proposed construction, alteration, or reconstruction will not materially impair the historic value of the structure, the commission shall reject the application for reconstruction or alteration, filing a copy of its rejection with the building inspector by whatever name known of the county or municipal corporation. An application for any such reconstruction or alteration, if rejected,

shall not be renewed within a period of one year after the rejection.

"(b) If an application is submitted for reconstruction, alteration, or for moving or demolition of a structure that the commission deems of unusual importance and no economically feasible plan can be formulated, the commission shall have ninety days from the time it concludes that no economically feasible plan can be formulated to negotiate with the owner and other parties in an effort to find a means of preserving the building."

"§ 8.10. Same — Approval under certain circumstances.

"In the case of a structure deemed to be valuable for the period of architecture it represents and important to the neighborhood within which it exists, the commission may approve the proposed reconstruction or alteration despite the fact the changes come within the provisions of subsection 8.09 above if (1) the structure is a deterrent to a major improvement program which will be of substantial benefit to the county or municipal corporation; (2) retention of the structure would cause undue financial hardship to the owner; or (3) the retention of the structure would not be to the best interests of a majority of persons in the community."

Section 8.11 provides for meetings for the commission, which are to be open to the public, for the right of any interested party or his representative to be heard, and for keeping open records of its resolutions, proceedings, and actions.

Section 8.12 provides:

"The commission shall file with the building inspector by whatever name known of the county or municipal corporation a certificate of its approval,

modification, or rejection of all applications and plans submitted to it for review. Work shall not be commenced on any such project until such a certificate of approval has been filed, and the building inspector shall not issue a building permit for such change or construction unless and until he has received such a certificate of approval. If there is no building inspector in the county or municipal corporation, the owner, lessee, or tenant of the property and premises shall not commence the proposed work or change until and unless he or it has received such a certificate of approval from the commission. The failure of the commission to act upon an application within forty-five (45) days from the date the application was filed shall be deemed to constitute automatic approval of the proposed changes unless an extension of this forty-five day period is agreed upon mutually by the applicant and the commission or the application has been withdrawn."

There are additional provisions for appeal by "[a]ny person or persons, firm, or corporation" aggrieved by the commission's decision similar to that provided from a decision of the zoning board or commission within the county or municipal corporation.

Article XI, "Historic District," of the Code of the City of Annapolis follows in similar language the provisions of Art. 66B, §§ 8.01 to 8.15. In addition, the Article delineates the boundaries of the Historic District in the City of Annapolis.

In Section 22-231(f) under the heading "Special considerations," it is provided:

"(1) In the case of an application for repairs or alteration affecting the exterior appearance of a structure or for the moving or demolition of a structure which the commission deems so valuable to the city, state or nation that the loss thereof will be a great loss to the city, state or nation, the commission shall endeavor to work out with the

owner an economically feasible plan for the preservation of such structure.

"(2) Unless the commission is satisfied that proposed construction, alteration or repair will not materially impair the historic value of a structure, the commission shall file with the building inspector its rejection of such application.

"(3) In the absence of a change in such structure arising from casualty no new application for the same or similar work shall be filed within one year after such rejection.

"(4) In the case of any structure deemed to be valuable for the period of architecture it represents and important to the neighborhood within which it exists, the commission may file with the building inspector its approval of such application if any of the circumstances under which approval might have been given under the preceding paragraphs are in existence or if:

a. Such structure is a deterrent to a major improvement program which will be of substantial benefit to the city.

b. Retention of such structure would cause undue financial hardship to the owner.

c. Retention of such structure would not be in the best interest of the majority of the community."

Section 22-235 contains the sanctions for violation of the Historic District Ordinance and provides that, in addition to other remedies and penalties, the building inspector, the Commission, or the zoning board of appeals "shall institute appropriate action to prevent, enjoin, abate or remove such violation."

Section 22-236 provides that any person or persons, jointly or severally, or firm or corporation, aggrieved by a decision of the Commission, may appeal to the Circuit Court for Anne Arundel County and also provides for a further appeal from that court to this Court.

The City of Annapolis is one of the municipal corporations having home-rule powers pursuant to Art. XI-E of the Maryland Constitution as implemented by Art. 23A of the Maryland Code. As a home-rule municipality, there are no limitations or provisions in the constitutional or statutory provisions which purport to exempt the County from the laws of the City of Annapolis. Indeed, Section 6 of Art. XI-E of the Constitution of Maryland provides that its charter "shall be subject to all applicable laws enacted by the General Assembly," of which the Act of 1963, Ch. 874, as amended, is obviously one.

The City of Annapolis is not only the capital of the State, but is also the county seat of Anne Arundel County, so that the County must obviously carry on functions in Annapolis. The City has recognized this in its charter. See Section 53 which provides:

> "The public lands and buildings heretofore purchased and built by the state or Anne Arundel County, in said city, are reserved and continued forever to the uses to which they have been allotted, and the judges of the several courts which have usually held their courts in the said city, in the public courthouse thereof, shall and may continue to do so; and the justices of the peace, county commissioners and sheriff of Anne Arundel County shall have, hold and exercise their jurisdiction in as full and ample manner in the said city as heretofore."

This Court has held, however, that a County can be subject to the reasonable police regulations of an incorporated municipality. In *Centreville v. Queen Anne's County*, 199 Md. 652, 87 A. 2d 599 (1952), the Town of Centreville — an incorporated municipality — in the exercise of its police powers, proposed to install and maintain certain parking meters on land owned by Queen Anne's County around Court House Square in Centreville. Queen Anne's County sought to enjoin the installation of the parking meters on its land and the Circuit Court for Queen Anne's County issued the injunction. On appeal, our

predecessors reversed and directed that the bill of complaint be dismissed. Judge Delaplaine, for the Court, stated:

> "Counties are created for the purpose of carrying out the policy of the State for the administration of matters of political government, including taxation, education, improvement of roads, and care of the poor, and for the administration of justice. The powers and functions of the county, as distinguished from municipal corporations, have a direct reference to the general, rather than the local, policy of · the government of the State. Municipal corporations are created principally for the advantage and convenience of the people of the locality. The powers of the counties under the general law of the State do not include the police power. The police power is delegated to the municipal corporations. *The counties must comply with reasonable police regulations in the interest of the general welfare. Cook County v. City of Chicago*, 311 Ill. 234, 142 N. E. 512, 516, 31 A.L.R. · 442."
> (Emphasis supplied.)
> 199 Md. at 655-56, 87 A. 2d at 600-01.

We observe that the City of Annapolis has subjected itself to the provisions of its own zoning laws (see Code of the City of Annapolis, Section 22-5) and that the County has also subjected itself to its zoning laws. (See Anne Arundel County Code, Section 13-334A)

The chancellor was of the opinion that historic zoning was analogous to traditional zoning and that the majority rule of our sister states that a county would not be subject to a municipal zoning ordinance in regard to a county governmental function applied.[4] We disagree with the chancellor's conclusion in this regard.

---

4. On the question of whether there is an implied exemption of one political subdivision from the effect of the traditional zoning laws of another political subdivision, *see* "Application of zoning regulations to governmental projects of activities," 61 A.L.R.2d 970 (1958); Note,

Assuming, *arguendo*, that the County intends to carry out a governmental function on the site where Mt. Moriah stands, we are of the opinion that there are substantial and significant differences between traditional zoning and historic area zoning, which indicate that the General Assembly by the Act of 1963, Ch. 874, as amended, intended that the political subdivisions owning land within a historic district be subject to the jurisdiction of the historic area commission.[5]

First of all, traditional zoning is primarily directed at the *use* of land, as well as the *density* and the *location* of buildings on the land. Historic area zoning, on the other hand, is not directed at any of these factors, but *only* at the *preservation* of the *exterior* of *buildings* having *historic or architectural merit*. In the present case, the County may use Mt. Moriah for any permitted use it desires. The limitation upon it by the Historic District Ordinance is that the exterior of Mt. Moriah not be destroyed or substantially altered without the permission of the Commission. Traditional zoning is directed at limited control of land within the framework of the police power; historic area zoning is directed at preservation of the exterior of certain buildings.

Secondly, to accomplish the primary purposes of historic area zoning, it is necessary that the exterior of the building having historic or architectural value be preserved against

*Governmental Immunity from Local Zoning Ordinances*, 84 Harv. L Rev 869 (1971); 2 Metzenbaum, The Law of Zoning, Chapter X-i (1955); 2 Rathkopf, The Law of Zoning and Planning, Chapter 53 (1960) and cases cited therein. *But see* St. Louis County v. City of Manchester, 360 S.W.2d 638 (Mo. 1962), indicating that, if the traditional zoning regulations have not completely excluded the proposed use and if there are reasonable alternatives available, then one political unit will be held to be subject to the zoning regulations of another political unit

**5.** The chancellor *assumed* that the County intended to use the site for an addition to the courthouse facility and that, inasmuch as the County "has the responsibility to support the Courts and the authority to acquire property and erect buildings thereon to carry out that task," a governmental function by the County was involved. The difficulty with this conclusion in the present case is that the County never established *by proof* how it intended to develop the site other than to use it as a *temporary* parking area *after the demolition of Mt. Moriah,* a rather clear case of "getting the cart before the horse," as it were. One cannot determine *from the evidence* whether the County intended to use the temporary parking area in connection with the use of the courthouse, as such, or whether it would temporarily use it in a proprietary capacity.

destruction or substantial impairment by *every one*, whether a private citizen or a governmental body. In short, the historically or architecturally valuable building is just as much lost by destruction by a public body as it would be by a private owner. The facts in the present case should lay to rest the notion that public bodies — as contrasted with private owners — would not be likely to press for demolition of buildings having established historic or architectural value. The General Assembly could well conclude that, to accomplish historic and architectural preservation, the jurisdiction of the Commission should extend to all owners be they private persons or governmental agencies. Otherwise, the primary purpose of the legislation would be frustrated.

In sum, the legislative intent is ascertained by considering the words used in the legislation in their plain and ordinary meaning; and when those words are not ambiguous, there is no need for application of the rules of statutory construction. *See Scoville Service, Inc. v. Comptroller of Treasury*, 269 Md. 390, 306 A. 2d 534 (1973); *Atlantic, Gulf and Pac. Co. v. State Dept. of Assess. & T.*, 252 Md. 173, 249 A. 2d 180 (1969); *Hunt v. Montgomery County*, 248 Md. 403, 237 A. 2d 35 (1968); and *Falcone v. Palmer Ford, Inc.*, 242 Md. 487, 219 A. 2d 808 (1966).

The chancellor, noting that § 8.02 of Art. 66B provides that the *procedure* for establishing a Historic District was to be that "applicable to the establishment or change of areas and classifications of zoning," indicated that the General Assembly believed that historic zoning was "analogous to traditional zoning" and hence the majority rule in regard to the impact of traditional zoning on governmental agencies was applicable to historic zoning. As indicated, we come to a different conclusion. Indeed, the fact that the *procedure* for traditional zoning is mandated for the establishment of the historic areas — giving of notice, filing of plats, etc. — indicates to us that the General Assembly intended that the *substance* of the new legislation in regard to historic area zoning was to be *different* from that of traditional zoning, rather than the contrary.

The chancellor was also of the opinion that Section 22-228(c) of Article XI of the Code of the City of Annapolis indicated an intention by the Mayor and Aldermen of the City of Annapolis to exclude the County from the jurisdiction of the Commission. Again, we disagree with this conclusion.

Section 22-228(c) provides:

> "(c) The provisions of this article shall not apply to any structure which must be removed or demolished by reason of the construction of a new public highway or by reason of the operation of any other law pertaining to the city relating to the repair or demolition of any building."

We interpret this language to be consistent with the enabling legislation — see § 8.13 — and thus the law in regard to repairs contemplates those repairs relating to ordinary *maintenance. See Groh v. Washington County*, 245 Md. 441, 445-46, 226 A. 2d 264, 267 (1967) to the effect that when an ordinance is enacted, pursuant to an enabling statute, the ordinance will be construed by reading it with the statute and if the language of both is substantially the same, it is presumed that the ordinance was designed to follow the statute. Under Section 22-228(c), the question of *the necessity* for removal or demolition by reason of the construction of a new highway is one which must be considered by the Commission so far as structures in the Historic District are concerned. If such removal or demolition *is necessary*, then the Commission will grant permission for such removal or demolition in accordance with the provision of subsection (c).

Although apparently not in the record, the brief for the City of Annapolis advises us — without contradiction in the opposing brief — that the City considers itself subject to the jurisdiction of the Commission and has submitted to the Commission "its own applications for a complete renovation and reconstruction of the City's Market House and for the construction of a new multi-level City parking garage" for the Commission's approval according to the Historic District Ordinance.

The County, in its brief and at argument, indicated that it was deprived of its property by the action of the Commission without due process of law and that its property was taken for public use without the payment of just compensation, contrary to the provisions of Article 23 of the Declaration of Rights in the Constitution of Maryland and Article III, § 40 of the Maryland Constitution.

So far as a taking without the payment of just compensation is concerned, in the posture in which this case reaches us, there most certainly is no confiscation in the present case. Indeed, the enabling statute and the ordinance do not limit the use of Mt. Moriah, but only provide that the Commission may prevent the destruction or change in *the exterior* of the building. Not only is the County not deprived of *all reasonable use* of the site and Mt. Moriah — the requirement for a finding of confiscation by the traditional zoning laws, *see Poe v. City of Baltimore*, 241 Md. 303, 216 A. 2d 707 (1966) and *Frankel v. City of Baltimore*, 223 Md. 97, 162 A. 2d 447 (1960) and prior cases cited in those opinions — but its *use* is not disturbed at all. In sum, the rather mild limitation in regard to Mt. Moriah's exterior is far removed from unconstitutional confiscation.

So far as any denial of due process of law is concerned, the protections for the property owner contained in the enabling statute and the Historic District Ordinance quite sufficiently afford a property owner due process of law, and did afford the County due process of law in the present case. The provisions in regard to notice and hearings are ample and effective. The standards and criteria for the Commission's decisions are adequate to protect a property owner, and did afford protection to the County in the present case.

The decision of the Commission, already set out in full, made careful findings supported by the substantial weight of the evidence produced before it at the hearings of June 20 and July 25 and was in no way arbitrary or capricious.

The testimony of Dr. Benjamin Quarlles of the faculty at Morgan State College, of Delegate Walter Dean, and of Franklin C. Shorell, Executive Director of the Maryland Commission on Negro History and Culture, sufficiently

supported the Commission's finding that Mt. Moriah had historic value. The testimony of John Murphy, representing the Maryland Historical Trust, and the documents introduced through him supported the Commission's finding that Mt. Moriah had architectural value and indeed was one of Annapolis' "hidden architectural treasures."

Dr. Quarlles testified in part in regard to the significance of Mt. Moriah to black history and culture, as follows:

"There are others here who will speak about this particular church, who know it quite well, who know its architectural quality and who know historically how very well it is going back, even to 1799, but when we come down to what a black church is, I think many of us may not be fully aware of that. There are probably few things that are more worth preserving to blacks than a black church.

"One of the greatest blacks, Frederick Douglass, who is perhaps the most prominent black in this state, has pointed out [that] the church is the Alpha [to] Omega of all things in black life. He was speaking in 1849, so that the black church was the first self-governing church. It had its own destiny, it was an outlet for black expression. Blacks could express themselves in many ways. So that the church was a religious organization, but it also was a forum for general expression, for social expression in black life. So that when we think of the black church, it has meant a great deal in black life. So that I think the blacks, the humanity of the black really had a religious base in a period when there was a great deal of discrimination against blacks.

"I need not say also when we come to the black church, we have an agency of grace, an agency of good will, an agency of brotherhood, an agency of fellowship in a period when race relations were particularly strained. So when I think of interracial

good will, I think of the preservation of a church, of a synagogue or any religious edifice.

"When I think of the notables from this state, this state had many more blacks, notable blacks, so when we have a church here in a historic city, a historic area going back, as we see on the walls, it would seem to me this was an especially historically minded audience, historic Annapolis, a historic church which has meant a great deal to a black community.

"So when I think of the black community as a totality, what it might symbolize in good will and the whole complex of American life, I think there is a greater responsibility to us to take a look at this kind of meaning that this church has, and when I think we think of that, it's an added dimension to what this church and the preservation of this church would mean, and that's why I commend it seriously to your attention."

The County did not produce evidence which would bring it within the "Special considerations" set forth in Section 22-231(f) of the Historic District Ordinance, particularly subsection (f)(4) a, b and c, which provides that the Commission may approve the application if the structure "is a deterrent to a major improvement program which will be of substantial benefit to the city," or if the "[r]etention of such structure would cause undue financial hardship to the owner" or if the retention of the structure "would not be in the best interest of the majority of the community."

In the present case, the County did not offer proof of a definite plan for a public improvement or other evidence which would bring its application within the criteria just mentioned. There may be cases arising before the Commission in the future in which the testimony is so clear and uncontradicted to the effect that the application fits within the above criteria, that a denial of the application might be held to be arbitrary or capricious, and thus a denial of due process of law. But, as we have indicated, the case, in its present posture, clearly is not one of them.

We do not reach the question of the extent of any obligation imposed upon the Commission by Art. 66B, § 8.09 and Art. XI, Secs. 22-231(f) of The Code of the City of Annapolis.

The County has the right by virtue of Section 22-231(f)3 of the ordinance to file a new application after one year from August 7, 1973, the date when its present application was rejected by the Commission, unless there is a change in Mt. Moriah, arising from a casualty, in which case an application may be filed sooner. Thus, the County is not blocked by the ordinance from filing a new application within a reasonable time if it deems such action to be in the public interest.

*Decree of September 5, 1973, reversed and the case remanded to the Circuit Court for Anne Arundel County for the entry of a decree declaring that the appellee, Anne Arundel County, is subject to the application of the Historic District Ordinance, sections 22-226 through 22-236, inclusive, of the code of the City of Annapolis and making permanent the injunction issued on September 6, 1973, enjoining the appellee, Anne Arundel County, from proceeding with the demolition of the building known as Mt. Moriah African Methodist Episcopal Church of Annapolis; the costs to be paid by the appellee, Anne Arundel County.*