WILLIAM A. FAULKNER et ux. t/a The Rendezvous Beauty Salon *v.* THE TOWN OF CHESTERTOWN et al.

|No. 122, September Term, 1980.|

*Decided April 30, 1981.*

The cause was argued before Murphy, C. J., and Smith, Digges, Eldridge, Cole, Davidson and Rodowsky, JJ.

*Elise Davis* for appellants.

*Paul M. Bowman* for appellees.

SMITH, J., delivered the opinion of the Court.

We are here involved with the interpretation and application of the historic zoning ordinance of Chestertown.[1] We shall affirm the decree of the Circuit Court for Kent County (Rasin, C. J.).

---

1. Chestertown is one of the oldest towns in the State of Maryland. We add a bit of explanation for the benefit of those who may not be aware of the historic heritage of Chestertown which its governing body sought to protect when the ordinance in question was enacted.

*Maryland Manual 1979-80* 492 (1979), says that Kent County was "[f]irst referred to as a county in 1642 when commissioners were appointed for the Isle and County of Kent." It thus is the second oldest of Maryland's counties. Originally it embraced all of the land east of the Chesapeake Bay. W. Howell, *Government of Kent County, Maryland* 13 (1931). Chestertown has been the county seat since about 1696 with the first courthouse there "being used before March 23, 1697/8 . . . ." M. Radoff, *The County Courthouses and Records of Maryland, Part One: The Courthouses* 106-07 (1960). See the discussion of Dr. Radoff in n. 14 at 107 relative to the exact date. F. Usilton, *History of Kent County* 244 (1916), records that the first courthouse located in Chestertown was "at the present location . . . ."

F. Usilton, *History of Chestertown* 12 (1899), states, "The town was laid out by authority of an Act of Maryland passed in 1706, and was named in the law 'New Town.' Its charter was revised in 1780 and the name Chester Town given to it."

It was at Immanuel Protestant Episcopal Church in Chestertown, located but a short distance from the building in question, where "was held the first convention which proposed and adopted the name Protestant Episcopal Church [on] November 9, 1780." W. Usilton, *History of Kent County* 532 (1980). The name was "to replace the designation, Church of England, in the Province." N. Harrington, *Shaping of Religion in America* 18, 128 (1980). At the same time "they adopted a Book of Common Prayer . . . ." *Id.*

An old customs house is situated in Chestertown. W. Howell, *op. cit.,* 13. It is located within the historic district in which the Faulkners' building is situated. F. Dumschott, *Washington College* 7 (1980), refers to Chestertown as "[i]n time . . . bec[o]m[ing] one of the important ports of entry in Maryland." Relative to the customs house R. Swain, Jr., *Chestertown as a Colonial Port, 1706-1775,* XIV Wash. C. Bull. (1936) states:

No one knows exactly when the supposed customs building at Water Street in Chestertown was built, as the county records do not mention it. There are, however, marks in this particular structure which indicate that it was renovated at least three different times, warranted by the expansion of Chestertown. The first section, it is believed, was erected not earlier than 1720 and the third section before the Revolution. The walls of this "customs" house are of large old-fashioned hand made bricks. It is said that every original brick is in place. [*Id.* at 5.]

Maryland Code (1957, 1978 Repl. Vol.) Art. 66B, §§ 8.01 — 8.15 authorizes, among others, "every municipal corporation, except the Mayor and City Council of Baltimore City", to establish historic zoning districts. Pursuant to that authority The Town of Chestertown, one of the appellees, set up two districts, one "consist[ing] of that land which constitutes the second survey of Chestertown made in the year 1730" and the other to "include part of the lands of Washington College, acquired by the Kent County Free School in the year 1723." The other appellee here, the Chestertown Historic District Commission (the Commission), was created by the Chestertown ordinance.

The ordinance is virtually a copy of the State's enabling act (the Act). The Act in § 8.07 and the ordinance in § i each provide that the historic district commission authorized by the Act and created by the ordinance "shall consider only exterior features of a structure and shall not consider any interior arrangements." Under § 8.05 of the Act "[b]efore the construction, alteration, reconstruction, moving, or demolition of any structure is made" within the historic area "if any changes are involved which would affect the exterior appearance of a structure visible or intended to be visible from an adjacent public way" in the historic district it is necessary to apply to the Commission "for permission to build, alter, reconstruct, move, demolish, or make the

---

H. Footner, *Rivers of the Eastern Shore* 326 (1944), says, "Chestertown always had its eye on Annapolis, but it was something more than a mere copy, being a busy port in its own right." S. Earle, *Chesapeake Bay Country* 324 (1923), refers to Chestertown as having been "long a port of entry" and says, "It is located on the Chester River and has many examples of colonial architecture, both along the river front and up in the town." H. Chandlee Forman, "sometimes known as the 'dean of Maryland architectural historians,'" in his *Maryland Architecture* 44 (1968), states, "Towns like Chestertown and Princess Anne are filled with interesting Georgian buildings."

The text of this opinion will quote from the reference in the ordinance to the second survey of Chestertown made in 1730 and to the lands of Washington College acquired by the Kent County Free School in the year 1723. Professor Dumschott, *op. cit.*, 6 states, "When a resurvey was made of the town, in 1730, the area along the river front was divided into lots, in order to encourage the owners to construct wharves for the convenience of vessels entering the port of Chester." Washington College was chartered by Chapter 8 of the Acts of 1782.

addition." A similar, but not identical, provision is found in § g of the ordinance.

Appellants, William A. Faulkner and Janice M. Faulkner, his wife, own the building located at 103 Cross Street, within one of Chestertown's two historic districts. They sought to improve the appearance of the building in which they operate a beauty parlor. Through their contractor they submitted an application to the Commission for permission to install "[d]ouble 4" vinyl siding, color green, no trim to be covered." The application was approved on February 7, 1979, "contingent upon siding being white or a light tan color" as specified in minutes of the Commission of the date the permit was issued. A later modification allowed use of green siding. The application for a permit made no mention of covering four second story windows which fronted on Cross Street. When the Commission met on May 2 the Town Manager reported that he had received complaints relative to the fact that these windows had been covered which had not been authorized by the permit. The Commission directed that the Faulkners "be notified that the siding be corrected to properly expose the windows to the previous state within 30 days, or the Commission w[ould] recommend to the [Town] Council that legal action be taken."

Counsel for the Faulkners met with the Commission on June 6 in an unsuccessful attempt to persuade the Commission to rescind its directive. True to the promise she made to the Commission, an action on behalf of the Faulkners against the Town and the Commission was filed promptly thereafter in the Circuit Court for Kent County. The bill sought, among other things, a temporary injunction restraining the defendants from prosecuting the Faulkners pending construction of the permit at issue; that a declaratory decree be entered construing the permit in question so that the Faulkners "m[ight] know what rights they had under the permit insofar as what they could or could not do to the building owned by them at 103 Cross Street"; that the court "declare illegal and ultra vires a rule, regulation or procedure of the Defendant Commission that prohibits the covering of any window or door on any building

within the historic district irregardless of whether or not the building has any historical or architectural significance"; and that if the court construed the permit to have prohibited covering the windows that it order the "Commission to issue a permit to [the Faulkners] authorizing them to cover the windows as Defendant Commission's rule against such covering is arbitrary, capricious, illegal and ultra vires as it was applied to Plaintiffs."

By reason of a demurrer which was overruled, the time for the filing of a cross-claim by the Town expired under Maryland Rule 314 d 2 on August 27. On August 30 the Town filed a cross-claim. Among other things it sought that the Faulkners "be ordered to remove the siding from around the second story, front windows of their . . . structure at 103 Cross Street." Because of this tardiness the Faulkners filed a motion ne recipiatur. On the same day the Town sought leave to file the cross-claim. This was granted nunc pro tunc as of August 30.

Ultimately an amended bill of complaint was filed contending that § g of the ordinance is "void for vagueness and hence unconstitutional in its application to [the Faulkners]."

A full trial was held. Chief Judge Rasin filed a comprehensive and well-reasoned opinion. A decree was signed in accordance with that opinion denying the relief sought by the Faulkners and directing that they "remove the siding from around the second story, front windows of their premises located at 103 Cross Street . . . within 60 days from the date of th[at] Decree." The Faulkners appealed to the Court of Special Appeals. Ex mero motu we issued a writ of certiorari prior to consideration of the appeal by that court.

The Faulkners contend (1) that the trial court erred in permitting the filing of the cross-claim over their objection "after the time specified in Rule 314"; (2) that since their "building was without known historical or architectural significance," the Town and the Commission were without "authority to thereafter control and restrict the changes desired and undertaken by [the Faulkners]"; (3) that a

historic commission acting pursuant to Art. 66B, § 8.01 et seq. may not "arbitrarily establish rules or personal attitudes and opinions with respect to what will or will not be permitted by way of alteration, including trim, color, windows and doors, particularly when a building has no known architectural or historical significance"; (4) that "[i]f the Court was correct in holding that a permit specifically allowing covering of windows was necessary [it] should . . . have ordered Appellees to issue such a permit"; and (5) that the local ordinance is unconstitutionally vague and therefore void.

### i The filing of the cross-bill

The Faulkners rely upon *Hardy v. Brookhart,* 252 Md. 107, 249 A.2d 148 (1969), in support of their contention that the trial judge erred when he permitted the filing of the cross-claim after the date specified in the rule. They say that "[t]he facts of this case are analogous to those in *Hardy . . .* wherein [we] upheld the trial court's denial of a motion to file a late Counter-claim." What they overlook is that Judge McWilliams said for the Court in *Hardy,* "Here we are concerned only with the question whether, in the circumstances, Judge Weant's denial of Hardy's motion amounts to an abuse of discretion." *Id.* at 114. After a careful review the Court concluded that there was no evidence that the trial judge "abused his discretion and without such evidence we shall not disturb his ruling." *Id.* at 115. In *A & P Co. v. Royal Crown,* 243 Md. 280, 285, 220 A.2d 598 (1966), Judge Hammond said for the Court, "The fact that the cross claim was not filed within fifteen days from the expiration of the last day for filing the responsive pleading to the claim to which the cross claim is addressed, as Rule 314 d 2 requires, would not prevent it being filed later by permission of the trial judge." *See also* Rule 309 b.

The basis for review is whether the chancellor abused his discretion. We find no abuse.

## ii Commission's authority

It is the contention of the Faulkners that their building has no "known architectural or historical significance" and that once this is determined the Commission is without authority to control their property. In support of their position they cite *City of Annapolis v. Anne Arundel Co.,* 271 Md. 265, 316 A.2d 807 (1974), stating:

> *City of Annapolis,* supra, analyzed Maryland's statute section by section. Judge Barnes came to the conclusion that the statute only applied to buildings having architectural or historical merit: "historic area zoning . . . is directed only at the preservation of the exterior of buildings having historic or architectural merit", *City of Annapolis,* supra at 291; "historic area zoning is directed at the preservation of the exterior of certain buildings", *City of Annapolis*, supra at 291; "the historically or architecturally valuable building", *City of Annapolis,* supra at 292.

They have misconstrued that case.

The Act begins in § 8.01 (a) (1) by stating, "The preservation of structures of historic and architectural value *together with the appurtenances and environmental settings* is a public purpose in this State." (Emphasis added.) Its express purposes as set forth in § 8.01 (b) are

> (1) to safeguard the heritage of the county or municipal corporation by preserving the district therein which reflects elements of its cultural, social, economic, political, or architectural history; (2) to stabilize and improve property values in such a district; (3) to foster civic beauty; (4) to strengthen the local economy; and (5) to promote the use and preservation of historic districts for the education, welfare, and pleasure of the residents of the county or municipal corporation.

The ordinance in § a says, "The preservation of structures of historic and architectural value is a public purpose in this state" and that "[t]he Mayor and Town Council of Chestertown believe that the public interest and convenience requires the preservation and protection of certain places and areas of historic interest, exterior architectural features and examples of the types of architecture found in the older areas of Chestertown." The ordinance then goes on in § b to follow the language of § 8.01 (b) of the Act. Section 8.05 requires an application for a permit "if any changes are involved which would affect the exterior appearance of a structure visible or intended to be visible from an adjacent public way in the district . . . ." The ordinance in § g requires the same. Factors for consideration in reviewing plans for construction or change are set forth in § 8.06 of the Act and § h of the ordinance. Each requires the Commission to "give consideration to (1) the historic or architectural value and significance of the structure and its relationship to the historic value of the surrounding area; (2) the relationship of the exterior architectural features of the structure to the remainder of the structure and to the surrounding area; (3) the general compatibility of exterior design, arrangement, texture, and materials proposed to be used; [and] (4) to any other factors including aesthetic factors which the commission deems to be pertinent." The Act in § 8.07 and the ordinance in § i provide that only exterior features of a structure and not any interior arrangements are to be considered. Section 8.08 of the Act and § j of the ordinance require the Commission to "be strict in its judgment of plans for those structures deemed to be valuable according to studies performed for districts of historic or architectural value" but to "be lenient in its judgment of plans for structures of little historic value or for plans involving new construction, unless such plans would seriously impair the historic or architectural value of surrounding structures of the surrounding area."

*City of Annapolis* involved Mt. Moriah African Methodist Episcopal Church, built in 1874 and located at the time of that case to the rear of the Anne Arundel County

courthouse. It had been purchased by that county with the thought of demolishing it and using the site for a parking structure and possible expansion of the courthouse and related facilities then in the courthouse. At the time of the purchase it was not included within the boundaries of the historic district of the City of Annapolis, but was included in that district shortly after its purchase by the county. As a result of a nomination made by the State through the Governor's Advisory Commission on Historic Preservation, it had been identified and placed on the National Register of Historic Places. The controversy involved the proposed demolition of the building. The county's expert "testified that Mt. Moriah was, in his opinion, an obstacle to the construction of the courthouse complex; that it would be expensive to move Mt. Moriah; and, that Mt. Moriah was not an appropriate structure for use in the courthouse complex." *Id.* 271 Md. at 270. It was in the context of that controversy that the Court's comment relative to the preservation of the exterior of buildings having historic or architectural merit was made. Judge Barnes said for the Court, "Traditional zoning is directed at limited control of land within the framework of the police power; historic area zoning is directed at preservation of the exterior of certain buildings." *Id.* 271 Md. at 291.

The portions of the Act we have quoted contradict the notion of the Faulkners that historic area zoning is directed only at preservation of the exterior of buildings having historic or architectural merit and that since their building has neither the Commission was without power in this instance. At the outset the Act refers to the preservation not only of structures of historic and architectural value but their "appurtenances and environmental settings . . . ." It also refers to preservation of the district "which reflects elements of [the municipality's] cultural, social, economic, political, or architectural history . . . ." As indicated in *City of Annapolis,* the Act concerns itself only with the exterior of buildings. The ordinance does likewise. The ordinance and the Act mandate the Commission to consider "the general compatibility of exterior design, arrangement, texture, and

materials proposed to be used ... to any other factors including aesthetic factors which the commission deems to be pertinent."

The concept of historic area zoning is summed up in 1 A. Rathkopf, *The Law of Zoning and Planning* § 15.01 (4th ed. 1975):

> In brief, the zoning of historic areas requires that whenever an application is made for a permit for the erection of any new building or for the alteration of or additions to any existing building within the historic district, the plans therefor so far as they relate to appearance, color, texture or materials, and architectural design of the exterior thereof must be submitted to a commission for review and approval, and in this manner to prevent the intrusion of any building which would be destructive of the nature of the district. [*Id.* at 15-2.]

The comment is made by M. Wiedl, III, *Historic District Ordinances,* 8 Conn. L. Rev. 209, 215-16 (1975), "Generally an historic district ordinance controls the demolition and exterior alteration of *all* buildings in the district, whether or not the buildings are historic or architecturally significant." (Emphasis added.) To similar effect see 2 P. Rohan, *Zoning and Land Use Controls* § 7.01 [2] at 7-10 (1981). J. Morrison, *Historic Preservation Law* 47 (1965), refers to the fact that "[a] defense frequently relied upon by property owners seeking to avoid the application of regulations and restrictions imposed under the police power is that preservation laws should not apply to structures that, while situated in the midst of historically and architecturally important buildings, are not in themselves of historic, traditional or architectural value." He states, however, "[T]he courts view an historical area or section as an entirety. That is, the buildings and structures are considered 'all together.'" *Id.*

One of the earliest cases on the subject of historic zoning is *City of New Orleans v. Pergament,* 198 La. 852, 5 So. 2d 129 (1941). The constitutional grant of authority to the

Commission there was for "the preservation of such buildings in the Vieux Carre section of the City of New Orleans as, in the opinion of said Commission, shall be deemed to have architectural and historical value, and which building should be preserved for the benefit of the people of the City of New Orleans and the State of Louisiana . . . ." The controversy concerned a sign erected without a permit. The sign was above the maximum size allowed under the ordinance. The Supreme Court of Louisiana said:

> The purpose of the ordinance is not only to preserve the old buildings themselves, but to preserve the antiquity of the whole French and Spanish quarter, the tout ensemble, so to speak, by defending this relic against iconoclasm or vandalism. Preventing or prohibiting eyesores in such a locality is within the police power and within the scope of this municipal ordinance. [*Id.* at 858.]

The Supreme Judicial Court of Massachusetts was queried by the Senate of that state relative to a proposed act establishing a historic district commission for the town of Nantucket. In its response in *Opinions of the Justices,* 333 Mass. 773, 128 N.E.2d 557 (1955), the court said in part:

> It is not difficult to imagine how the erection of a few wholly incongruous structures might destroy one of the principal assets of the town, and we assume that the boundaries of the districts are so drawn as to include only areas of special value to the public because of possession of those characteristics which it is the purpose of the act to preserve. [*Id.* at 780.]

To borrow the phrase used by Judge McWilliams for the Court in another context in *Suitland Dev. v. Merchants Mort.,* 254 Md. 43, 53, 254 A.2d 359 (1969), the whole concept of historic zoning "would be about as futile as shoveling smoke" if, *e.g.,* as pointed out from the bench at argument, because a building being demolished had no

architectural or historical significance a historic district commission was powerless to prevent its demolition and the construction in its stead of a modernistic drive-in restaurant immediately adjacent to the State House in Annapolis.[2]

Since the Faulkners' building was located within one of Chestertown's historic districts, we hold it to have been subject to the jurisdiction of the Commission notwithstanding the fact that it had no architectural or historical significance.

### iii The Commission's rules and regulations

To the inquiry of the Faulkners as to whether "a historic commission acting pursuant to Article 66B, § 8.01 et seq. [may] arbitrarily establish rules or personal attitudes and opinions with respect to what will or will not be permitted by way of alteration, including trim, color, windows and doors, particularly when a building has no known architectural or historical significance," we respond that the issue is not before us. The Faulkners were permitted to use the color of their choice. Their application for a permit simply failed to disclose their intent to cover the windows. They did not ask for a permit to cover the windows. The permit which was issued did not authorize the covering of the windows. Had they desired to so change the exterior appearance of the building, it was incumbent upon them to make application for a permit for that purpose. Since no such application was made, we decline to engage in a theoretical exercise as to what the attitude of the members of the Commission would have been had a request for a permit to cover the windows been made. We have no reason to say that they would have been arbitrary. There is a strong

---

2. The cornerstone for this building was laid by Sir Robert Eden, Maryland's last colonial Governor, on March 28, 1772. M. Radoff, *The State House at Annapolis* 7 (1972). It is said to be the oldest State capitol in continuous use in the United States. General George Washington resigned his commission to the Continental Congress in the Senate chamber of that building on December 23, 1783. T. McKeldin, *Washington Bowed* (1956) and *Maryland Manual 1973-74* 39 (1974). The latter states also that it was here that Congress on January 14, 1784, ratified the Treaty of Paris ending the Revolutionary War.

presumption that public officers will properly perform their duties. *Acting Dir., Dep't of F. & P. v. Walker,* 271 Md. 711, 719, 319 A.2d 806 (1974), and cases there cited.

### iv Permit for the windows

The Faulkners suggest that if the trial court were correct in holding that a permit specifically allowing covering of windows was necessary, then the chancellor should have directed the issuance of such a permit. Again, we decline to engage in a theoretical exercise. If they want a permit, it is incumbent upon them to make application for it.

### v Vagueness

In their contention that the local ordinance is unconstitutionally vague and therefore void the Faulkners focus on § g. It states:

> g. Before the construction, alteration, repair, moving or demolition of any structure is made within the districts of "Old Chestertown"; if any changes are involved which would affect the exterior appearance of a structure visible or intended to be visible from an adjacent public way in the districts, the person, individual, firm, or corporation proposing to make the construction or change shall file with the commission, through the Town Clerk, an application for permission to build, alter, repair, move, demolish, or make the addition. Every such application shall be referred to and considered by the Historical District Commission and no permit for any change may be granted until the commission has acted thereon as hereinafter provided.

The only difference other than local adaptations between this section and § 8.05 of the Act is that where the latter uses the words "reconstruction" and "reconstruct" the ordinance uses the word "repair."

We see no need to engage in a review of cases concerning constitutionality of statutes. To us the Act and ordinance are clear and capable of understanding by people of ordinary intelligence, notwithstanding the contention by the Faulkners that many people do not know what it means. The first clause in its reference to "construction, alteration, repair, moving or demolition" is simply an attempt to be all inclusive. It must be read with the second clause which states that "if any changes are involved which would affect the exterior appearance of a structure visible or intended to be visible from an adjacent public way in the districts," then an application for permit must be filed. It may be that the first clause is susceptible of criticism for using too many words, just as lawyers have been criticized for writing "grant and convey," "give, devise and bequeath," and the like. In plain language what the ordinance and the Act are saying is that if one proposes to do anything to a building within a historic district which will involve changes to the exterior appearance of the structure visible from a street or alley in the district, then one must obtain a permit. That is so plain we see no reason why people of ordinary intelligence would be unable to comprehend the meaning of the Act and the ordinance.

*Decree affirmed; appellants to pay the costs.*