767 A.2d 906

**COMMITTEE FOR RESPONSIBLE DEVELOPMENT ON 25TH STREET et al.,**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE et al.**

**No. 2927, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

March 1, 2001.

64

J. Carroll Holzer (Holzer & Lee, on the brief), Towson, for appellants.

Sandra R. Gutman, Chief Solicitor (Frank C. Derr, Deputy City Solicitor, on the brief), Baltimore, for Mayor & City Council.

Stephen H. Kaufman (Howard Alderman, Jr., and Levin & Gann, P.A., on the brief), Towson, for CVS, Inc.

Stanley Fine (Rosenberg, Proutt, Funk & Greenberg, on the brief), Baltimore, for Wexler.

Argued before KENNEY, ADKINS and WILLIAM W. WENNER (Ret'd, specially assigned), JJ.

KENNEY, Judge.

This case arises out of a judgment of the Circuit Court for Baltimore City ("the City") dismissing a request for judicial review made by appellant, Douglas M. Armstrong ("Armstrong"), and the Committee for Responsible Development on 25th Street (the "Committee"), based on lack of standing.[1] Armstrong and the Committee had petitioned for judicial review of a decision of the Board of Municipal and Zoning Appeals (the "Board") denying their appeal of the issuance of a permit to appellees Robert Wexler ("Wexler") and Charles Street Baltimore CVS, Inc. ("CVS").

Appellant presents three questions on appeal, which we have reworded and reordered as follows:

1. Is the interpretation of Council Ordinance Number 967, creating a Parking Lot District, as it relates to accessory parking lots, a matter of great public importance and likely to reoccur and therefore not moot?

2. Does an unaggrieved taxpayer in Baltimore City have standing to petition for judicial review of a decision of the Board of Municipal and Zoning Appeals?

---

**1.** The Committee for Responsible Development conceded that it had no standing, and it is not a party to this appeal. Although Armstrong consistently referred to "appellants" in his brief, we shall refer only to Armstrong or appellant when discussing his arguments.

3. Is the appellant aggrieved and thus has standing to petition for judicial review of a decision of the Board of Municipal and Zoning Appeals?

Finding no error, we affirm.

## FACTS AND PROCEEDINGS

On July 9, 1999, the City issued a permit to Wexler and his lessee, CVS, that allowed them to consolidate lots and erect a drugstore/pharmacy on property located at 2500–2506 North Charles Street (the "Property"). The permit contemplated the demolition of ten vacant buildings in order to accommodate the pharmacy and the adjacent parking lot containing sixteen parking spaces.

The Property is zoned B–2–3 business; a pharmacy is a permitted use within that zoning area. The Property is also within the Charles Village parking lot district. Section 9.0–1 of the Baltimore City Zoning Ordinance ("BCZO") requires accessory off-street parking to support the permitted use.[2]

Armstrong resides at 2828 North Howard Street, which is approximately two blocks west and three blocks north of the Property. Armstrong, along with the Committee,[3] appealed the grant of the permit. Both argued that the BCZO required plans for a parking lot like the sixteen space lot contemplated by CVS "to be reviewed by the Civic Design Commission and ultimately authorized 'by an ordinance approved by the Mayor and City Council of Baltimore.' "

The Board held a hearing on August 31, 1999. At the hearing, Armstrong argued, on behalf of himself and the Committee, that the capacity of the CVS parking lot was more than double what was needed in a B–2–3 district. He also expressed concern about the need to raze ten row houses to make way for a retail structure that did not blend in with the

---

2. The ordinance provisions set out in this opinion are those in effect in 1999 when the Board decided the case.

3. Douglas M. Armstrong was Chairman of the Committee at the time of the appeal.

historical character of the neighborhood. He also argued that the exterior design of the CVS did not meet the requirements under the zoning ordinances. Armstrong and other citizens appearing at the hearing argued that CVS needed to obtain an ordinance to build the sixteen space parking lot because of its location in a parking lot district.

At the hearing, the attorney for the Mayor and City Council of Baltimore (the "City") argued as follows:

I can say that the standard practice and procedure of the zoning office has been to approve accessory parking for all uses in the parking lot districts without requiring an ordinance. The language, and I do agree that the language isn't the best wherein they talked about parking lots versus as a permitted use without saying anything about accessory. It's silent on the accessory aspect of it. The—I mean that, I think, is something that's poorly written in the ordinance. However, the standard practice and procedure ever since 1971 when the ordinance was implemented has been to allow accessory parking without applying the requirements of parking lots.

The City acknowledged that if the parking lot were the principal use of the property, an ordinance would be necessary. A parking lot is defined by the BCZO as "the land used for the off-street parking of three or more motor vehicles together with the adjoining and perimeter areas required under this section or elsewhere under the laws and ordinances of Baltimore City." BCZO § 9.0–3(b). The City noted that the principal use of the property in this case was for a pharmacy and that, consequently, the proposed parking lot was an accessory use. The City, moreover, contended that the zoning ordinance does not prohibit developers from providing more parking spaces than required in an accessory lot, even when the development is in a parking lot district.

The City, CVS, and Wexler all adduced evidence that other retail establishments in the neighborhood, specifically Hollywood Video and a Safeway supermarket, had accessory parking with spaces in excess of the minimum requirements.

These businesses had not been required to receive ordinance approval because the City believed an ordinance was unnecessary for accessory use parking lots.

The Board handed down its decision sustaining the grant of the permit on September 9, 1999. Appellants filed a request for judicial review to the Circuit Court for Baltimore City. Appellees Wexler and the City moved to dismiss the appeal, arguing that both Armstrong and the Committee lacked standing. In their response to the motion to dismiss, "Appellants concede[d] that the Committee lacks standing, [but argued that] it is without question that Douglas Armstrong possesses such standing to bring this appeal." Along with his response to the motion to dismiss, Armstrong filed an affidavit stating that all of the information in the motion was true and correct and attaching documents concerning both his own property as well as affected property on Charles Street.

The circuit court held a hearing on January 7, 2000, and granted the motion to dismiss, stating:

> In this particular case, the Court has been reaching for that which needs to be done. The question before this Court, and this Court's finding is whether or not it's a showing of Mr. Armstrong being an aggrieved party. The Court does not have before it that which is clearly a contact to him. Arguably, that his house from his steps, the front or back, he cannot see the location.

> Someone would argue, well he doesn't have to walk past it, but that's why he's there. He would like to walk down the street and see and feel Charles Village as being what it was when he decided to move there and that his kids will know what Charles Village is, and his grandkids will know why he moved there. And hopefully he sticks around.

> In this particular case before the Court, the Court does not have what it needs to have in accordance to that which has been found and decided not only by *Brynaiarski*, but several other cases, reported, I might add, that deals with the issue. The *McCormick Spice* case dealt with the issue

raised here, specifically as to what it looks like in its impact and why we feel that it should not be torn down. . . .

What is very clear to this Court is that you have to be more specific in the battle to be able to make your argument. . . .

They stand that which is before me in applicable law, the Court grants the motion to dismiss. As to the Committee, the Court further finds, based on the applicable law and the cases and its interpretation, the Court is required to grant the motion to dismiss as to Mr. Armstrong, with its apologies.

Armstrong's motion to reconsider was denied by the court on February 25, 2000. This appeal followed.

## DISCUSSION

### I. Mootness

Appellant argues that this case is not moot even though appellees had already razed the buildings in order to commence construction of the pharmacy and parking lot. He asks us to decide how the particular provisions of the zoning ordinances should be applied in this case.

▮ "A case is moot when there is no longer an existing controversy between the parties at the time it is before the court so that the court cannot provide an effective remedy." *Coburn v. Coburn,* 342 Md. 244, 250, 674 A.2d 951 (1996). Moot cases are generally dismissed without a decision on the merits. *Coburn,* 342 Md. at 250, 674 A.2d 951. In rare instances, however, we can address a moot case if it "presents 'unresolved issues in matters of important public concern that, if decided, will establish a rule for future conduct,' or the issue presented is 'capable of repetition, yet evading review.' " *Stevenson v. Lanham,* 127 Md.App. 597, 612, 736 A.2d 363 (1999) (citations omitted).

In the instant case, Armstrong was attempting to prevent the destruction of designed buildings along Charles Street. These buildings have been destroyed, so we cannot provide an

effective remedy, as the buildings cannot be put back.[4] Armstrong argues that this Court could still provide him with an effective remedy by requiring aesthetic changes or a reduction in the number of parking spaces. Armstrong appears to us to be requesting that we order appellees to abide by the requirements of BCZO § 9.0-3, but any failure by the appellees to abide by the requirements of the ordinance is not at issue in this case.[5]

Rather, we must decide whether our interpretation of the ordinance would fall into one of the two categories that would

---

**4.** We note that the buildings could not have been destroyed if Armstrong had filed a bond in this matter.

**5.** h. *Design and Maintenance*

1. *Surfacing.* Parking spaces shall be surfaced and maintained with a dustless all—weather material in accordance with the Building Code of Baltimore City. . . .

2. *Screening and landscaping.* Where a parking facility with five or more parking spaces either adjoins or is within 100 feet of a lot in a Residence or Office–Residence District and is visible from ground level of a Residence or Office–Residence District, such parking facility shall be effectively screened from such lot in the Residence or Office–Residence District. Screening shall consist of a masonry wall or durable fence, or combination thereof, not less than four feet, nor more than eight feet in height, together with a planting strip on the outside of such wall or fence. In lieu of such wall or fence, a compact evergreen hedge of not less than four feet in height at time of original planting may be used. New screening shall not be required in the event the parking facility is already effectively screened by a terrain or landscaping feature, or by a railroad right-of-way or siding track. Screening and landscaping shall be maintained in good condition and shall be so designed and placed so as not to obstruct vehicle sight distances at entrances and exits.

3. *Lighting.* Illumination, if provided, of parking facilities shall be arranged so as not to reflect direct rays of light into any adjacent Residence or Office–Residence District. In no case shall direct and indirect illumination from the source of light exceed an illumination level maximum of one-half foot candle when measured at the nearest point of the lot line in a Residence or Office–Residence District.

4. *Signs.* Accessory signs shall be permitted with parking facilities in accordance with the provisions set forth in Chapter 10 of this ordinance.

5. *Repair and service.* No motor vehicle repair work or service of any kind shall be permitted in parking spaces, except emergency repair service.

BCZO 9.0–2(h).

allow us to address the substance of appellant's arguments despite the fact that his case is moot. Appellant advises that he "has reason to believe additional development requiring parking lots within the district will occur in the imminent future," and we do not doubt that development will continue to occur.

We must examine the likelihood of someone else being in Armstrong's position, that is, a party before the Board but not a person aggrieved for the purposes of judicial review before the circuit court. According to the statute, "[a]ppeals to the Board of Zoning Appeals may be taken by any person aggrieved . . . by any decision of the administrative officer." Maryland Code (1957, 1998 Repl.Vol.), Art. 66B, § 2.08(d). We note that Armstrong's standing before the Board was never at issue. In any event, the requirements for administrative standing are such that one may have administrative standing, but lack standing to seek judicial review. *Sugarloaf Citizens' Ass'n v. Dep't of Environment*, 344 Md. 271, 285–86, 686 A.2d 605 (1996). Thus, it is conceivable that a concerned citizen or group of citizens may be allowed to argue against a zoning decision before the Board but not be sufficiently aggrieved to seek judicial review of the Board's decision.

In addition, Armstrong's ability to bring a declaratory judgment action in this case is uncertain. The Board has primary jurisdiction over zoning issues.[6] If Armstrong filed a declara-

---

6. BCZO § 11.0–3(b) sets out the jurisdiction of the Board:

b. *Jurisdiction.* The Board shall have the following jurisdiction and authority:

1. to hear and decide applications for conditional uses in the manner prescribed by and subject to the standards established herein;

2. to hear and decide applications for special exceptions from the terms provided in this ordinance in the manner prescribed by and subject to the standards established herein;

3. to hear and decide applications for variances from the terms provided in this ordinance in the manner prescribed by and subject to the standards established herein;

4. to hear and decide appeals where it is alleged there is error in any order, requirement, decision, or determination made by the Zoning Administrator under this ordinance;

tory judgment action regarding the interpretation or constitutionality of the ordinance, he would first have to exhaust his administrative remedies. *Josephson v. City of Annapolis*, 353 Md. 667, 675–76, 728 A.2d 690 (1998); *Respess v. City of Frederick*, 82 Md.App. 253, 259–60, 571 A.2d 252 (1990). This scenario would lead to the same problem with standing that exists in the present case, as we will discuss *infra*. Even assuming that he could meet the requirements of showing a "justiciable controversy" pursuant to Md.Code (1974, 1998 Repl.Vol.), § 3–409(a) of the Courts and Judicial Proceedings Article, he would lack standing.

 Standing to bring a declaratory judgment is the same as for other cases; there must be a "legal interest" such as "one of property, one arising out of a contract, one protected against tortious invasion, or one founded on a statute which confers a privilege." *Baltimore Steam Co. v. Baltimore Gas & Elec. Co.*, 123 Md.App. 1, 15, 716 A.2d 1042 (1998) (quoting *Tennessee Elec. Power Co. v. Tennessee Valley Auth.*, 306 U.S. 118, 137–38, 59 S.Ct. 366, 369, 83 L.Ed. 543 (1939)). We recognize that *Baltimore Steam Co.* has since been vacated by the Court of Appeals because the case had become moot during the appellate process. *Baltimore Gas & Elec. Co. v. Baltimore Steam Co.*, 353 Md. 142, 725 A.2d 549 (1999). Nevertheless, we believe that our explanation of standing in the administrative context is helpful:

5. to hear and decide all matter referred to it or upon which it is required to act under this ordinance;
6. to receive all proposed amendments to this ordinance referred to it by the City Council and report its findings and recommendations;
7. to promulgate rules and regulations applicable to Additional Industrial Uses in the M–2 Industrial District pursuant to Section 7 .2–1d of this ordinance;
8. to adopt and establish general rules for the conduct of its proceedings; and
9. in furtherance of this authority, the Board shall forward to the Zoning Administrator copies of all matters acted upon by the Board— including orders, requirements, decisions, determinations, rules, regulations, and all other data and information necessary for the proper administration and enforcement of this ordinance.

Ordinarily, only the public authorities have standing to seek redress for violations of the public laws, and a private individual has standing to do so only when she can show that she has " 'suffered some special damage [read "injury"] from such wrong differing in character and kind from that suffered by the general public.' " *Becker v. Litty,* 318 Md. 76, 92–93, 566 A.2d 1101, 1109 (1989) (quoting *Weinberg v. Kracke,* 189 Md. 275, 280, 55 A.2d 797, 799 (1947)).

*Baltimore Steam Co.,* 123 Md.App. at 18, 716 A.2d 1042. Armstrong has not suffered, nor will he conceivably suffer, "special damages" such that he will have standing to bring a declaratory judgment action.

We believe that the circumstances present an issue of public concern that is "capable of repetition yet evading review." Thus, we would be prepared to address the substance of appellant's argument if he indeed has standing.

## II. Standard of Review

Appellant appeals an order of the trial court that granted appellees' separate cross-motions to dismiss based on appellant's lack of standing. Both parties' pleadings, however, contained supplemental information that the judge did not exclude during the hearing, including the entire record below as well as documents attached to the parties' motions. Thus, because the standard for reviewing a motion to dismiss is different from the standard for reviewing a motion for summary judgment, we must first resolve what motion the court actually granted even though it stated that it granted the motion to dismiss.

The record indicates that the parties in this case supplemented their motions with various materials, including copies of plats, an affidavit, tax documents, and applications to raze different buildings along North Charles Street. As this Court stated in *Boyd v. Hickman,* 114 Md.App. 108, 689 A.2d 106, *cert. denied,* 346 Md. 26, 694 A.2d 949 (1997):

When the circuit court considers matters outside the pleadings, the court treats the matter as a motion for summary

judgment, and the legal effect of the ruling in favor of the moving party is to grant a motion for summary judgment notwithstanding the court's designation of the ruling as a motion to dismiss.

*Id.* at 117–18, 689 A.2d 106 (citations omitted); *see* Md. Rule 2–322(c).

■ Because the circuit court considered materials outside the pleadings,[7] the order in this case was a grant of a motion for summary judgment and we will treat it as such. "When reviewing the trial court's grant of a motion for summary judgment, we must consider whether a dispute of material fact existed and whether the trial judge was legally correct." *Taylor v. Feissner,* 103 Md.App. 356, 366, 653 A.2d 947, *cert. denied,* 339 Md. 355, 663 A.2d 73 (1995).

### III. Standing of Appellant as a Taxpayer

Armstrong's first argument is that, as a taxpayer, he had standing to petition for judicial review of the Board's decision to uphold the grant of the permit. As support for this argument, he points to Section 11.0–3($l$)(1) of the BCZO, which states:

> Any person or persons jointly or severally aggrieved by any decision of the Board, or any taxpayer, or any officer, department, board, or bureau of the municipality, may appeal such decision to the Baltimore City Court setting forth that such decision is unlawful, in whole or in part, and specifying the unlawful grounds thereof.

This language dates back to at least 1950.

The Maryland Code, on the other hand, states:

> Any person or persons, or any taxpayer, or any officer, department, board, bureau of the jurisdiction, jointly or severally aggrieved by any decision of the board of appeals,

---

7. The trial court indicated that it had looked "over every page, of every bit of paper submitted by each one" of the appellants. Thus, we conclude that it looked outside the four corners of the pleadings.

or by a zoning action by the local legislative body, may appeal the same to the Circuit Court for Baltimore City. Art. 66B, § 2.09(a). This language went into effect with the 1970 amendment to the statute.

Despite appellant's arguments to the contrary, a conflict exists between the local zoning ordinance and the foregoing Code provision, as the local ordinance allows a taxpayer, whether aggrieved or not, to appeal a decision by the Board. *See Boulden v. Mayor & Comm'rs of Town of Elkton,* 311 Md. 411, 414, 535 A.2d 477 (1988) (interpreting a State statute with almost identical language as allowing non-aggrieved taxpayers to appeal a zoning decision). The Code, however, requires the taxpayer to have been aggrieved by the Board's decision. *See Boulden,* 311 Md. at 417, 535 A.2d 477 (stating that a municipal ordinance with language substantially identical to that of Art. 66B, § 2.09 required aggrievement). In situations like this, where there is a conflict between a Baltimore City ordinance and a public general law of the State, the public general law controls:

> All such local laws enacted by the Mayor of Baltimore and City Council of the City of Baltimore or the Council of the Counties as hereinbefore provided, shall be subject to the same rules of interpretation as those now applicable to the Public Local Laws of this State, except that in case of any conflict between said local law and any Public General Law now or hereafter enacted the Public General Law shall control.

Md. Const., art. XI–A, § 3. *See also Boulden,* 311 Md. at 415, 535 A.2d 477.

■ Armstrong attempts to circumvent the plain language of the statute by citing a number of cases allowing taxpayers standing in Baltimore City by virtue of their status as taxpayers. *See, e.g., City of Baltimore v. Byrd,* 191 Md. 632, 62 A.2d 588 (1948); *Norwood Heights Improvement Ass'n., Inc. v. Mayor & City Council of Baltimore, et al.,* 195 Md. 368, 73 A.2d 529 (1950); *Windsor Hills Improvement Ass'n., Inc. v. Mayor & City Council of Baltimore,* 195 Md. 383, 73 A.2d 531

(1950); and *Kennerly, et al. v. Mayor & City Council of Baltimore*, 247 Md. 601, 233 A.2d 800 (1967). As appellant conceded at oral argument, each of these cases concerns an earlier version of Art. 66B, § 2.09 and are not instructive.

Appellant relies heavily on *Sipes v. Board of Municipal and Zoning Appeals*, 99 Md.App. 78, 635 A.2d 86 (1994), in arguing that he had standing by virtue of his status as a taxpayer. He cites to the following dicta for support: "there is no question that Sipes, as a taxpayer, was entitled to appeal the decision of the Board." *Sipes*, 99 Md.App. at 90, 635 A.2d 86. This is not a holding of the case, however, as Sipes' standing as both a taxpayer and as an aggrieved party was not contested. *Sipes*, 99 Md.App. at 89, 635 A.2d 86. As noted by the Court, the "only question the parties ask us to decide is whether Sipes could intervene in an appeal after the running of the thirty day appeal period, where that appeal was originally filed by parties without standing." *Sipes*, 99 Md.App. at 90, 635 A.2d 86. The issue of conflict between Art. 66B, § 2.09 and subsection 11.0–3(*l*)(1) of BCZO was not raised in *Sipes*.

Appellant seeks to bolster his argument by stating that the words "or other taxpayer" in Article 66B, § 2.09 are superfluous because if aggrievement is required of any party seeking an appeal "any person or persons aggrieved" would be sufficient. Under longstanding rules of statutory construction, we should avoid rendering a clause, sentence, or phrase "surplusage, superfluous, meaningless, or nugatory." *State v. Pagano*, 341 Md. 129, 134, 669 A.2d 1339 (1996) (quoting *Montgomery County v. Buckman*, 333 Md. 516, 524, 636 A.2d 448 (1994)). If we accepted appellant's arguments, we could be rendering a good portion of the statute—"or any taxpayer, or any officer, department, board, bureau of the jurisdiction"—meaningless.

Appellant next argues that, by enacting Art. 66B, § 2.09(f), the legislature gave the Mayor and City Council of Baltimore City the power to broaden standing to request judicial review of Board decisions. BCZO § 11.0–3(*l*)(1). Section 2.09(f) states:

In addition to the appeal provided in this section, the Mayor and the City Council may provide for appeal to the Circuit Court for Baltimore City *of any matter* arising under the planning and zoning laws of the City of Baltimore. The decision of the Circuit Court for Baltimore City may be appealed to the Court of Special Appeals. This subsection does not restrict any charter or other power of the city.

Art. 66B, § 2.09(f) (emphasis supplied).

 Of course, "[e]very quest to discover and give effect to the objectives of the legislature begins with the text of the statute." *Huffman v. State,* 356 Md. 622, 628, 741 A.2d 1088, 1091 (1999). If the legislature's intentions are evident from the text of the statute, our inquiry normally will cease and the plain meaning of the statute will govern. *Adamson v. Correctional Medical Services, Inc.,* 359 Md. 238, 251, 753 A.2d 501 (2000) (citations omitted). The plain language of § 2.09(f) concerns the appeal of "matters" arising under the planning and zoning laws of Baltimore City, and not standing. We do not interpret the language of this statutory provision as allowing the Mayor or City Council to expand standing beyond that conferred by the State legislature. We hold that taxpayers must be aggrieved in order to seek judicial review of the decision of the Board.

 If we find that the BCZO § 11.0–3(*l*)(1) is in conflict with and preempted by Art. 66B, § 2.09(a), as we have done, appellant then argues that State statute is unconstitutional, because it "arbitrarily discriminates against residents and taxpayers of Baltimore City as opposed to taxpayers located in the counties." Armstrong did not raise this issue before the trial court, so it is unpreserved for appeal. Moreover, this argument is without merit. We view Armstrong's claim as resting on equal protection grounds. *See Gooslin v. State,* 132 Md.App. 290, 297, 752 A.2d 642, *cert. denied,* 359 Md. 334, 753 A.2d 1031 (2000). Equal protection claims will be reviewed under the rational basis standard unless the classification burdens a "suspect class" or impinges upon a "fundamental right." *Gooslin,* 132 Md.App. at 297–98, 752

A.2d 642. Suspect classes include gender, race, illegitimacy, and alienage, and not place of residence. *Murphy v. Edmonds,* 325 Md. 342, 357, 601 A.2d 102 (1992). As appellant conceded at oral argument, there is no "suspect class" involved here.

Our next inquiry, therefore, is whether the right at issue here is a "fundamental right." The right at issue is the right to have a decision of the zoning Board reviewed by the circuit court.

> The right to an appeal is not a right required by due process of law, nor is it an inherent or inalienable right. *Lindsey v. Normet,* 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972); *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); *Brown v. State,* 237 Md. 492, 498–499, 207 A.2d 103, 108 (1965); *Winkler v. State,* 194 Md. 1, 16–17, 69 A.2d 674, 679–680 (1949), and cases therein cited. *See also* 16 Am.Jur.2d Constitutional Law § 584 (1964); 2 Am.Jur.2d Administrative Law § 557 (1962); 4 Am.Jur.2d Appeal and Error § 1 (1962). An appellate right is entirely statutory in origin and no person or agency may prosecute such an appeal unless the right is conferred by statute. *See Lohss v. State,* 272 Md. 113, 116, 321 A.2d 534, 536–537 (1974); *Mace Produce Co. v. State's Attorney,* 251 Md. 503, 508, 248 A.2d 346, 350 (1968); *Subsequent Injury Fund v. Pack,* 250 Md. 306, 309, 242 A.2d 506, 509 (1968); *Switkes v. John McShain, Inc.,* 202 Md. 340, 343, 96 A.2d 617, 619 (1953). *See also Ex parte Abdu,* 247 U.S. 27, 38 S.Ct. 447, 62 L.Ed. 966 (1917[1918]); 2 J. Poe, Pleading and Practice § 826 (Tiffany ed.1925). If appellate review is not permitted unless expressly granted by statute, as was held in *Urbana Civic Ass'n, Inc. v. Urbana Mobile Village, Inc.,* 260 Md. 458, 460–461, 272 A.2d 628, 630 (1971), a fortiori, there is equally no right of appeal if that right is expressly excluded by statute.

*Criminal Injuries Comp. Board v. Gould,* 273 Md. 486, 500, 331 A.2d 55 (1975); *see also Holmes v. Robinson,* 84 Md.App. 144, 151, 578 A.2d 294 (1990), *cert. denied,* 321 Md. 501, 583 A.2d 275 (1991). Here, the right to appeal the Board's

decision is limited by the statute such that not everyone can appeal. Thus, we review this law under the rational basis test.

 "The rational basis test requires appellant to prove that (1) the County treated [him] differently than it treated others similarly situated, and (2) the disparate treatment did not bear a rational relationship to a legitimate interest." *Security Management Corp. v. Baltimore County*, 104 Md. App. 234, 243–44, 655 A.2d 1326, *cert. denied*, 339 Md. 643, 664 A.2d 886 (1995). The sum total of appellant's argument is:

> Taxpayers in the county have a right to appeal based upon Article 66B, Section 4.08. Wexler acknowledges that Article 66B, Section 4.08 permits taxpayers in the county to appeal zoning decisions to the Circuit Court in the exact same fashion as the Baltimore City Ordinance and the earlier provisions of Article 66B. There is no rationale or justification in the legislation to suggest that the Maryland General Assembly has any basis to discriminate against taxpayers of Baltimore City, as compared with taxpayers in the counties in denying them the same ability to appeal. The Appellants have found no language which would support and justify the distinctions between rights of taxpayers to appeal in the City as opposed to the counties authorized under Article 66B. If a law is applied and administered by public authority "with an evil eye and an unequal hand" so as to make unjust discriminations between persons in similar circumstances, material to their rights, such denial of equal justice is within the prohibition of the Constitution. See *Bruce v. Director of Common Dept. of Chesapeake Bay Affairs[Director, Dept. of Chesapeake Bay Affairs]*, 261 Md. 585, at 600 [276 A.2d 200] (1971).

As to an appeal within Baltimore City there is, of course, no discrimination. Anyone, including taxpayers from outside Baltimore City, wishing to appeal a Board decision to the Circuit Court for Baltimore City must show aggrievement. The alleged discrimination arises from the differences in standing vis-à-vis appeals of zoning decisions in Baltimore City and the appeal of zoning decisions in other jurisdictions. Thus, we

look at whether this different treatment of Baltimore City bears a rational relationship to a State interest.

We first look at the differences in the statutes governing standing to appeal zoning decisions. We begin first with the provisions relating to chartered counties:

> To enact local laws providing (1) for the establishment of a county board of appeals whose members shall be appointed by the county council; (2) for the number, qualifications, terms, and compensation of the members; (3) for the adoption by the board of rules of practice governing its proceedings; and (4) for the decision by the board on petition by any interested person and after notice and opportunity for hearing and on the basis of the record before the board, of such of the following matters arising (either originally or on review of the action of an administrative officer or agency) under any law, ordinance, or regulation of, or subject to amendment or repeal by, the county council, as shall be specified from time to time by such local laws enacted under this subsection: An application for a zoning variation or exception or amendment of a zoning ordinance map; the issuance, renewal, denial, revocation, suspension, annulment, or modification of any license, permit, approval, exemption, waiver, certificate, registration, or other form of permission or of any adjudicatory order; and the assessment of any special benefit tax: Provided, that upon any decision by a county board of appeals it shall file an opinion which shall include a statement of the facts found and the grounds for its decision. *Any person aggrieved by the decision of the board and a party to the proceeding before it may appeal to the circuit court for the county which shall have power to affirm the decision of the board, or if such decision is not in accordance with law, to modify or reverse such decision, with or without remanding the case for rehearing as justice may require.* Any party to the proceeding in the circuit court aggrieved by the decision of the court may appeal from the decision to the Court of Special Appeals in the same manner as provided for in civil cases.

Md.Code (1957, 1998 Repl.Vol.1999 Suppl.), Art. 25A, § 5(U) (emphasis supplied).

The statute governing standing in Baltimore City is similar:

Any person or persons, or any taxpayer, or any officer, department, board, bureau of the jurisdiction, jointly or severally aggrieved by any decision of the board of appeals, or by a zoning action by the local legislative body, may appeal the same to the Circuit Court for Baltimore City.

Art. 66B, § 2.09(a).[8]

Standing to appeal zoning decisions from code counties, county commissioners counties, and municipalities other than Baltimore City to the circuit court is broader:

Any person or persons, jointly or severally, aggrieved by any decision of the board of appeals, or by a zoning action by the local legislative body, or any taxpayer, or any officer, department, board, bureau of the jurisdiction, may appeal the same to the circuit court of the county.

Art. 66B, § 4.08(a). This language more closely tracks the language of Art. 66B, § 2.09 in effect prior to the 1970 amendment.[9]

---

8. We note that, despite the conflict between BCZO § 11.0–3($l$)(1), the new version of the Baltimore City Code, which was completely revised and renumbered in the year 2000, maintains this conflict. In fact, the revised ordinance makes it even more clear that a taxpayer purportedly has standing:

§ 17–302. Who may appeal.
A final administrative decision of the Board may be appealed to the Circuit Court for Baltimore City by:
(1) any person aggrieved by the decision;
(2) any officer, department, board, or bureau of the City; or
(3) any taxpayer.

A search of the legislative history revealed no notes concerning the amendments to and enactment of this ordinance.

9. The statutory language of this provision in effect in 1963, for example, stated: "Any person or persons jointly or severally aggrieved by any decision of the board of zoning appeals, or any taxpayer, or any officer, department, board or bureau of the municipality, may appeal to a court of record on the ground that such decision is illegal in whole or in part." Md.Code (1957, 1963 Cum.Supp.), Art. 66B, § 7(j).

■■■ Thus, Baltimore City is treated like a charter county, and the difference in treatment is not limited to it alone. Moreover, in looking at the rational relationship between the law and the State interest, we " 'will not overturn' the classification 'unless the varying treatment . . . is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [governmental] actions were irrational.' " *Murphy,* 325 Md. at 355, 601 A.2d 102 (citations omitted). Appellant has pointed us to nothing that would show that the government's actions in treating appeals of zoning decisions differently in Baltimore City from those in other counties is irrational.

The Court of Appeals has held in the past that Baltimore City may be treated differently than the counties in the State. *See Davidson v. Miller,* 276 Md. 54, 81, 344 A.2d 422 (1975) (upholding Md. Const. art. IV, § 8 allowing county litigants to remove their cases to another county, while limiting a City litigant's right to do so). Another case, in which the Court of Appeals upheld Md. Const. art. IV, § 22 giving county but not City citizens the right to an *en banc* appeal before their circuit courts, merits special attention. *Washabaugh v. Washabaugh,* 285 Md. 393, 404, 404 A.2d 1027 (1979); *see also Maryland Aggregates Ass'n v. State,* 337 Md. 658, 672 n. 9, 655 A.2d 886 (1995). *Washabaugh* cited to an 1880 Supreme Court case in recognizing the continuing constitutionality of a state legislature treating different territories within its jurisdiction differently:

As respects the administration of justice, [a state] may establish one system of courts for cities and another for rural districts, one system for one portion of its territory and another system for another portion. Convenience, if not necessity, often requires this to be done, and it would seriously interfere with the power of a State to regulate its internal affairs to deny to it this right. We think it is not denied or taken away by anything in the Constitution of the United States, including the amendments thereto.

We might go still further, and say, with undoubted truth, that there is nothing in the Constitution to prevent any

State from adopting any system of laws or judicature it sees fit for all or any part of its territory. If the State of New York, for example, should see fit to adopt the civil law and its method of procedure for New York City and the surrounding counties, and the common law and its method of procedure for the rest of the State, there is nothing in the Constitution of the United States to prevent its doing so. This would not, of itself, within the meaning of the Fourteenth Amendment, be a denial to any person of the equal protection of the laws. If every person residing or being in either portion of the State should be accorded the equal protection of the laws prevailing there, he could not justly complain of a violation of the clause referred to. For, as before said, it has respect to persons and classes of persons. It means that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances.

The Fourteenth Amendment does not profess to secure to all persons in the United States the benefit of the same laws and the same remedies. Great diversities in these respects may exist in two States separated only by an imaginary line. On one side of this line there may be a right of trial by jury,[10] and on the other side no such right. Each State prescribes its own modes of judicial proceeding. If diversities of laws and judicial proceedings may exist in the several States without violating the equality clause in the Fourteenth Amendment, there is no solid reason why there may not be such diversities in different parts of the same State. A uniformity which is not essential as regards different States cannot be essential as regards different parts of a State, provided that in each and all there is no infraction of

---

**10.** This reference to jury trials is merely an example of diversity of treatment that may exist. The Supreme Court in *Missouri v. Lewis* upheld a law requiring litigants in five counties to appeal to an intermediate Court of Appeals rather than directly to the Missouri Supreme Court. Direct appellate review in the Missouri Supreme Court was available to litigants in those five counties only in certain, specified circumstances. 101 U.S. at 29.

the constitutional provision. Diversities which are allowable in different States are allowable in different parts of the same State. Where part of a State is thickly settled, and another part has but few inhabitants, it may be desirable to have different systems of judicature for the two portions— trial by jury in one, for example, and not in the other. Large cities may require a multiplication of courts and a peculiar arrangement of jurisdictions. It would be an unfortunate restriction of the powers of the State Government if it could not, in its discretion, provide for these various exigencies.

*Washabaugh*, 285 Md. at 405–07, 404 A.2d 1027 (quoting *Missouri v. Lewis*, 101 U.S. 22, 30–32, 25 L.Ed. 989 (1879)). *See also Howlett v. Rose*, 496 U.S. 356, 372, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990) (affirming the proposition in *Missouri v. Lewis* that "States thus have great latitude to establish the structure and jurisdiction of their own courts"); and *North v. Russell*, 427 U.S. 328, 338, 96 S.Ct. 2709, 49 L.Ed.2d 534 (1976) (upholding "Kentucky's constitutional provisions classifying cities by population and its statutory provisions permitting lay judges to preside in some cities while requiring law-trained judges in others" in light of *Missouri v. Lewis* ).

The *Washabaugh* Court referred to "Baltimore City's heavily burdened judicial machinery," 285 Md. at 409, 404 A.2d 1027, as one reason to uphold the law in that case. The court system in Baltimore City is no less burdened today, and this in itself would be a rational basis to restrict appeals in zoning matters only to those parties actually aggrieved by the decision. Editorial, *Prosecutors Seek Bottom Line*, Baltimore Sun, Oct. 21, 2000, at 12A; Michael Janofsky, *Baltimore's Push on Crime Creates Backlog of Cases*, N.Y. Times, Jan. 17, 1999, at A14.

## IV. Whether Appellant was Aggrieved by the Board's Decision

Appellant's next argument is that he was, in fact, aggrieved by the Board's decision for the following reasons:

his contacts and close proximity to the subject site which makes [sic] him an aggrieved party. Secondly, he resides within the same parking lot district as the subject site and is therefore has an interest [sic] over and above that of the other members of the public in Baltimore City. Finally, since the parking lot district legislation contains aspects of historical preservation, that Appellant residing within the district has sufficient contact to enforce the nature and purposes of the district as it relates to the preservation of important structures as well as the aesthetics applicable to the pharmacy and parking lot.

In *Bryniarski v. Montgomery County Bd. of Appeals*, 247 Md. 137, 143, 230 A.2d 289 (1967), cited by the trial court in dismissing the case for lack of standing, the Court of Appeals stated that, in order to have standing to appeal a decision of an administrative agency to the circuit court, an individual (1) must have been a party to the proceeding before the Board, and (2) must be aggrieved by the decision of the Board. There is no argument that Armstrong was a party to the proceeding before the Board, so we must determine whether he was aggrieved by the Board's decision.

Previous decisions of the Court of Appeals

indicate that a person aggrieved by the decision of a board of zoning appeals is one whose personal or property rights are adversely affected by the decision of the board. The decision must not only affect a matter in which the protestant has a specific interest or property right but his interest therein must be such that he is personally and specially affected in a way different from that suffered by the public generally.

*Bryniarski*, 247 Md. at 144, 230 A.2d 289; *see also Sugarloaf Citizens' Ass'n*, 344 Md. at 288, 686 A.2d 605; and *DuBay v. Crane*, 240 Md. 180, 185, 213 A.2d 487 (1965).

While noting that standing was to be decided on a case by case basis, the Court of Appeals did provide some factors to consider when making that determination:

(a) It is sufficient if the facts constituting aggrievement appear in the petition for appeal either by express allegation or by necessary implication. *Town of Somerset v. Montgomery County Board of Appeals*, 245 Md. 52, 225 A.2d 294 (1966).

(b) An adjoining, confronting or nearby property owner is deemed, *prima facie*, to be specially damaged and, therefore, a person aggrieved. The person challenging the fact of aggrievement has the burden of denying such damage in his answer to the petition for appeal and of coming forward with evidence to establish that the petitioner is not, in fact, aggrieved....

(c) A person whose property is far removed from the subject property ordinarily will not be considered a person aggrieved. *Wilkinson v. Atkinson*, 242 Md. 231, 218 A.2d 503 (1966); *DuBay v. Crane, supra; City of Greenbelt v. Jaeger*, 237 Md. 456, 206 A.2d 694 (1965); *Marcus v. Montgomery County Council*, 235 Md. 535, 201 A.2d 777 (1964); *Pattison v. Corby*, 226 Md. 97, 172 A.2d 490 (1961). But he will be considered a person aggrieved if he meets the burden of alleging and proving by competent evidence-either before the board or in the court on appeal if his standing is challenged-the fact that his personal or property rights are specially and adversely affected by the board's action.

*Bryniarski*, 247 Md. at 144–45, 230 A.2d 289. Generally, to be considered an aggrieved party, the complaining property owner must be in "sight or sound" range of the property that is the subject of his complaint. *Md.-Nat'l Cap. P. & P. v. Rockville*, 269 Md. 240, 248, 305 A.2d 122 (1973); *Wier v. Witney Land Co.*, 257 Md. 600, 612–13, 263 A.2d 833 (1970).

 With these principles in mind, we shall evaluate Armstrong's standing to challenge the City's action in this case. Armstrong does not live so close to the Property that he is "per se" aggrieved. Armstrong lives two blocks west and three blocks north of the Property, and he cannot see it or hear activity taking place on it from his house. Although he

frequently passes it, so do many other members of the general public. He presented no evidence that the pharmacy and its parking lot would cause his property to devaluate.

Appellant cites a number of cases to bolster his arguments that, by virtue of his proximity to the pharmacy site, he is aggrieved. None of these cases, however, apply, because they either concern complainants who were within sight of the property at issue, *Wier*, 257 Md. at 613, 263 A.2d 833; *Chatham Corp. v. Beltram*, 252 Md. 578, 580, 251 A.2d 1 (1969); complainants who were very close (100 feet) to the property at issue, *Cassel v. City of Baltimore*, 195 Md. 348, 353, 73 A.2d 486 (1950); the complainants provided proof that their property values would depreciate, *Toomey v. Gomeringer*, 235 Md. 456, 460, 201 A.2d 842 (1964); or the complainants lived in a rural area such that, even though they were fairly far physically from the site, the less dense population gave them standing by virtue of their fears of depreciation in property values and school overcrowding. *Board of Zoning Appeals v. Bailey*, 216 Md. 536, 539, 141 A.2d 502 (1958).[11]

Armstrong next argues that because he lives within the same parking lot district as the pharmacy, and, because a prior ordinance "contained historical preservation aspects of preserving and preventing destruction of historical and irreplaceable properties within the parking lot use district," this provides him with a "special interest or property right" to everything within the district. Armstrong cites *Faulkner v. Town of Chestertown*, 290 Md. 214, 428 A.2d 879 (1981), in support of this contention.

We find *Faulkner* to be inapposite. The issue of standing was not raised in *Faulkner*. *Faulkner* concerned the actions of two building owners within a designated historic district in

---

11. The Court of Appeals has long recognized that the impact of zoning decision in rural and semi-rural areas can be different than in urban and suburban areas. That is, neighborhoods in rural areas may extend farther, because the damage from a particular decision may be much wider reaching, than in an urban or suburban setting. *Pattey v. Bd. of County Comm'rs for Worcester County*, 271 Md. 352, 363, 317 A.2d 142 (1974).

the town of Chesterton. The purpose behind a designated historic district is quite different than the purpose behind the creation of parking lot districts in Baltimore City. As the Court of Appeals noted in *Faulkner*, the stated purposes of the State statute governing historic preservation is:

(1) to safeguard the heritage of the county or municipal corporation by preserving the district therein which reflects elements of its cultural, social, economic, political, or architectural history; (2) to stabilize and improve property values in such a district; (3) to foster civic beauty; (4) to strengthen the local economy; and (5) to promote the use and preservation of historic districts for the education, welfare, and pleasure of the residents of the county or municipal corporation.

*Faulkner*, 290 Md. at 221, 428 A.2d 879 (quoting Maryland Code (1957, 1978 Repl.Vol.), Art. 66B, § 8.01(b)).

In general, the concept of designating certain areas as "historic" is described by a commentator as follows:

In brief, the zoning of historic areas requires that whenever an application is made for a permit for the erection of any new building or for the alteration of or additions to any existing building within the historic district, the plans therefor so far as they relate to appearance, color, texture or materials, and architectural design of the exterior thereof must be submitted to a commission for review and approval, and in this manner to prevent the intrusion of any building which would be destructive of the nature of the district.

*Faulkner*, 290 Md. at 224, 428 A.2d 879 (quoting 1 A. Rathkopf, *The Law of Zoning and Planning* § 15–2 (4th ed.1975)).

Although the City Council clearly expressed concern over historic preservation issues in enacting its ordinance establishing parking lot districts, the stated purpose behind the creation of parking lot districts was "to protect the public against traffic, fire, or health hazards which may be created or

associated with parking lots or the operation thereof." Baltimore City, Md., Ordinance 967 (1967).[12] Baltimore City parking lot districts are not the same as historic districts.

While we sympathize with appellant's wish to preserve the historic character and aesthetics of his neighborhood, we do not find that his interests in the matter are any different than the interests of a member of the general public. Although he lives within the parking lot district, his interests are still too attenuated to make him personally aggrieved by the Board's decision in this case.

---

**12.** The introductory portion of the Ordinance states:

WHEREAS, One of the most serious problems affecting the downtown area of Baltimore City is the indiscriminate construction and presence of parking lots throughout this area.

Some of these lots are well planned and attractive and are an asset to the community. Unfortunately, many of them are eyesores, and a detriment to the entire downtown area. Also it is unfortunate that many of them have been created through the destruction of historical and irreplaceable properties.

Under existing laws and ordinances of Baltimore City, parking lots may be constructed in any commercial area by the simple method of obtaining a permit from the Bureau of Building Inspection, and these permits are easily available. Although large portions of the downtown area are zoned for commercial use, many of the buildings on the fringes of the downtown area are residential in appearance and character. Some of these are of the valuable and historic townhouse type which can never be replaced. The recent destruction of the valuable townhouse in the 100 block West Franklin Street and the planned destruction of three such buildings in the 1000 block of North Charles Street are examples of the removal of townhouse type of buildings which can never be replaced.

Frequently in the construction of parking facilities it has been the practice to tear down two or three buildings in a block, thus destroying the aesthetic beauty of the entire block. Considerable portions of Charles Street provide prime examples of this type of misuse of parking facilities.

The City Council finds that such an ordinance is needed to protect the public against traffic, fire, or health hazards which may be created or associated with parking lots or the operation thereof.

It is necessary and highly desirable for the preservation of valuable and historic properties adjacent to the downtown area of Baltimore City and also for promoting and assuring the attractiveness of the City of Baltimore that a new zoning area be created in order to provide restrictions and requirements upon the establishment and operation of parking lots; now, therefore . . .

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**